**Roberto PENA, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 08–02–00361–CR.**

Court of Appeals of Texas,
El Paso.

Jan. 29, 2004.

Joseph (Sib) Abraham Jr., El Paso, for Appellant.

Jaime E. Esparza, District Attorney, El Paso, for State.

Before Panel No. 2 BARAJAS, C.J., McCLURE, and CHEW, JJ.

## OPINION

DAVID WELLINGTON CHEW, Justice.

Appellant Roberto Pena was indicted with two counts of intoxication manslaugh-

ter and two counts of failure to stop and render aid. Before a jury, Appellant pled guilty to all four counts, but pled "not true" to the allegation that he used or exhibited a deadly weapon during the commission of the offense as alleged in each count. The jury found Appellant guilty of all four counts and made an affirmative finding on the use of a deadly weapon for each count. The jury assessed punishment at twenty years' imprisonment and a $10,000 fine for each intoxication manslaughter count and five years' imprisonment and a $5,000 fine for each failure to stop and render aid count. Upon the State's motion, the trial court ordered that the intoxication manslaughter counts be served consecutively, with the failure to stop and render aid counts to be served concurrently. The trial court sentenced Appellant in accordance with the jury's assessment, however we observe the court's final judgments and sentences only contain deadly weapon findings for the intoxication manslaughter offenses. In his sole issue on appeal, Appellant contends the trial court committed reversible error by admitting testimony from a State's witness concerning the speed his vehicle was traveling when it struck the victims' vehicle and that this testimony severely prejudiced him. We affirm.

On June 17, 2001, between 12:30 and 1 a.m., Zachary Valenzuela was driving in the center lane on Gateway West when he noticed headlights in his rear view mirror. The rate of speed at which the car was coming at him from behind was the reason the headlights caught his attention. Mr. Valenzuela was driving between 55 to 60 miles per hour. He considered changing lane, but at the rate of speed the vehicle was approaching, he decided to stay in the center lane. When the approaching vehicle pulled up behind Mr. Valenzuela, it switched lanes, "flew by him," and pulled back into the center lane. Mr. Valenzuela recalled that the vehicle approached him from behind at a constant speed and was easily going over 60 miles per hour because it quickly passed him. As it passed, Mr. Valenzuela observed that the vehicle was a green Corvette driven by a male driver, later identified as Appellant.

As the Corvette traveled ahead to the Lee Trevino intersection, Mr. Valenzuela kept the vehicle's taillights in his line of sight and recalled there was nothing between him and the Corvette. Mr. Valenzuela saw cars stopped at the lights ahead. He then saw the Corvette's taillights swerve to one side and for a split second, saw car headlights turn quickly facing his direction before they turned. Mr. Valenzuela hit his brakes when he saw the headlights because he knew he was traveling on a one-way street. He knew there had been an accident, but did not see the actual impact. Mr. Valenzuela recalled that the Corvette's brake lights did not go on before the accident.

Veronica Huerta Garcia was at the Lee Trevino and Gateway West intersection at the time of the accident. Ms. Garcia was in the middle lane behind a green Eclipse and in front of a black Pontiac, waiting for the light to change. All the cars waiting for the light were in the middle lane. When the light turned green, Ms. Garcia drove a little bit forward and then heard a loud impact of vehicles being struck behind her. She looked at her rearview mirror and saw a car, a Honda CRX pop up, go airborne, and then land with its headlights facing the opposite direction. To her left, Ms. Garcia saw a green Corvette slam against the guardrail, causing sparks to fly. She noticed that the Corvette hit the guardrail at a high rate of speed and then came to a sudden stop. When Ms. Garcia saw everything right behind her, she quickly swerved to the right to avoid being

hit in the chain reaction. She then called 911 on her cell phone.

Within seconds, Ms. Garcia checked on some of the cars involved in the accident. The Corvette was damaged in the front of the hood and on the side that hit the guardrail. Ms. Garcia had contact with the driver, Appellant, and recalled that he was drunk and smelled strongly of alcohol. She helped Appellant exit the Corvette, before going to assist the injured passenger and driver of the Honda CRX.

Robert Herrera, his wife, and their two children, were also at the Lee Trevino Gateway West intersection at the time of the accident. Mr. Herrera recalled there was one car in front of him and two cars behind him. While he was waiting in the center lane for the light to change, Mr. Herrera heard a loud crash and felt the impact. Right after the accident, Mr. Herrera went straight to the Corvette and observed Appellant trying to get out of the vehicle. Mr. Herrera was yelling at Appellant and tried to take off the car window before his wife called him away.

Miguel Garcia, Jr. and his spouse were traveling home from Horizon City on Interstate 10 and exited at Lee Trevino. Mr. Garcia recalled that it was a nice evening with no inclement weather. As he exited, he saw that an accident had just occurred right in front of the Shamaley Ford dealership, a very well lit area. Mr. Garcia saw a Honda Civic turned around facing oncoming traffic, a Corvette to his left, and some other cars in front. As he approached the scene, he veered off to the Shamaley Ford entranceway toward Gateway West. Mr. Garcia got out of his car and went over to assist the passengers in the Honda Civic. Mr. Garcia then approached the Corvette and made contact with Appellant. He observed that Appellant was talking on a cell phone in Spanish, smelled of alcohol, and was very disoriented. Mr. Garcia recalled Appellant telling him to go to the other guys because they looked pretty bad. Mr. Garcia then left Appellant and later noticed that he had fled the scene.

Ronald Drake, a security guard for Shamaley Ford on duty at the time of the accident, observed a man running through the dealership's parking lot. As the man ran, he was bouncing off the cars, stumbling, and fell twice. Mr. Drake saw the man drop his cell phone twice as he ran. As he started to approach the individual who had stumbled and fallen down, Mr. Drake smelled a lot of alcohol and backed off. The man ran across the back lot and then headed east on Rojas. Mr. Drake then observed the fire department, an ambulance, and police coming down Lee Trevino and traveling on Gateway West the wrong way. Mr. Drake went to the accident scene and informed the police about the man running through the parking lot.

El Paso Police Officer Steve Smith was dispatched to the multi-car accident scene at approximately 12:35 a.m. Officer Smith recalled that it was a clear night, the roadway was dry, and the location was well-lit by the Shamaley Ford dealership. From his preliminary investigation, he determined that the green Corvette had traveled westbound on Gateway West in the center lane and had struck the Honda vehicle in front of it, which then struck the vehicle in front of it, which in turn struck another vehicle in front of that one. Of the four vehicles involved in the accident, three were facing west and one, the Honda vehicle, was facing eastbound as it had spun around due to the impact. Officer Smith observed extensive damage to the rear of the Honda vehicle.

The most critically injured in the accident were the two occupants of the Honda vehicle first struck by the Corvette. The front passenger, Mario Sandoval, was not

breathing and was pronounced dead at the scene. Dr. Juan Contin, the county medical examiner, determined that Mario Sandoval bled to death from a torn aorta in the chest, which resulted from the collision. After the accident, the driver, Roberto Sandoval, was not conscious and had a very faint pulse. Mr. Sandoval was taken to the hospital, but died the following day from massive brain injuries sustained in the accident.

Around 2:12 a.m., police officers apprehended Appellant as he stumbled towards his house on Tony Tejeda. Appellant was arrested and taken to the accident scene where he was identified by witnesses as the individual driving the Corvette. Appellant was later taken to Del Sol Medical Center where his blood was drawn. The blood test results showed Appellant had a blood-alcohol level of .23.

Ruben Cisneros, an El Paso police officer assigned to the special traffic investigations section, testified that based on his accident reconstruction analysis, he found no pre-impact brake marks nor any pre-impact skid marks for the Corvette. Officer Cisneros observed extensive front end damage to the Corvette, extensive rear damage to the Honda, and paint transfer from the Honda to the Corvette. Based on his observations and the skid marks, Officer Cisneros determined the front end of the Corvette collided with the back end of the Honda Civic CRX. After the initial impact, the rear end of the Honda "climbed up" on the front end of the Corvette, causing the vehicle to spin clockwise 80 degrees and go airborne before coming to a stop. When the Corvette struck the Honda, its left front tire locked up due to front end damage. The Corvette then veered to the left lane and collided with the guardrail, leaving a post-impact skid mark from the left front tire.

At trial, Appellant objected to Officer Cisneros' testimony as an expert witness concerning the speed of the vehicles involved in the accident. Over Appellant's objection, Officer Cisneros testified that based on his accident reconstruction formula calculations, he determined the initial impacting vehicle, the Corvette, was traveling 104 miles per hour. He also determined the Honda was impacted from zero speed to a post-impact speed of 28 miles per hour.

### Expert Testimony

In his sole issue for review, Appellant argues the trial court committed reversible error by admitting Officer Cisneros' testimony concerning the speed his vehicle was traveling on June 17, 2001 and that this testimony severely prejudiced him. Specifically, Appellant contends the State did not meet its burden in establishing that Officer Cisneros was qualified as an expert witness nor did it present evidence concerning the reliability of the "AIMS test" used to establish the speed his vehicle was traveling when it struck the Honda CRX.

### Standard of Review and Applicable Law

A trial court's ruling to admit or exclude evidence is reviewed under an abuse of discretion standard. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim.App.1991)(Op. on reh'g). Absent a clear abuse of discretion, a trial court's decision to admit or exclude expert testimony will not be disturbed. *Wyatt v. State*, 23 S.W.3d 18, 27 (Tex.Crim.App. 2000); *Morales v. State*, 32 S.W.3d 862, 865 (Tex.Crim.App.2000). An abuse of discretion exists when the trial court's decision was so clearly wrong as to lie outside the zone of reasonable disagreement, in other words, the trial court's decision or action was arbitrary, unreasonable, and made without reference to any guiding

rules or principles. *See Montgomery*, 810 S.W.2d at 391.

For a witness's expert testimony to be admissible, the witness must be qualified as an expert by "knowledge, skill, experience, training, or education...." TEX. R.EVID. 702. Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

TEX.R.EVID. 702.

■ The party offering the evidence has the burden of showing the witness is qualified as an expert on the specific matter in question. *Penry v. State*, 903 S.W.2d 715, 762 (Tex.Crim.App.1995), *cert. denied*, 516 U.S. 977, 116 S.Ct. 480, 133 L.Ed.2d 408 (1995).

■ Pursuant to *Kelly v. State*, 824 S.W.2d 568 (Tex.Crim.App.1992), the proponent of expert testimony or evidence based on a scientific theory must show by clear and convincing evidence that the evidence is: (1) reliable and (2) relevant to assist the trier of fact in its fact-finding duty. *Id.* at 572; *Ochoa v. State*, 994 S.W.2d 283, 284 (Tex.App.-El Paso 1999, no pet.). To be reliable, the proffered evidence must satisfy three criteria: (1) the underlying scientific theory must be valid; (2) the technique applying the theory must be valid; and (3) the technique must have been properly applied on the occasion in question. *Kelly*, 824 S.W.2d at 573. The trial court's determination of reliability could be affected by the following non-exclusive factors: (1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community, if such a community can be ascertained; (2) the qualifications of the expert(s) testifying; (3) the existence of literature supporting or rejecting the underlying scientific theory and technique; (4) the potential rate of error of the technique; (5) the availability of other experts to test and evaluate the technique; (6) the clarity with which the underlying scientific theory and technique can be explained to the court; and (7) the experience and skill of the person(s) who applied the technique on the occasion in question. *Id.*

*Daubert/Kelly Hearing*

At trial, Appellant objected to Officer Cisneros' testimony as an expert witness concerning the speed of the vehicles involved in the accident. Outside the jury's presence, Officer Cisneros testified that on many occasions, he has done speed reconstruction. He has had a variety of training courses in speed reconstruction, specifically the basic accident investigation course offered by the police department, the intermediate accident investigation course, the advanced accident reconstruction course, and the traffic accident reconstruction course. In 1997, Officer Cisneros received approximately 80 hours in accident reconstruction training in San Antonio at the Bexar County Sheriff's Department. He also has had training in bicycle, pedestrian, and motor vehicle collisions. In August 1999, Officer Cisneros was certified in the 383rd District Court as an expert and again in October 2001 in the 41st District Court.

In this particular case, Officer Cisneros determined the speed of the Corvette and other vehicles by using formulas he had been taught to use for specific types of collisions. Officer Cisneros inserted certain data that was obtained from the scene into these formulas to derive the speeds. Officer Cisneros explained that he worked

the calculations out by hand using a calculator and used a skid speed formula for the post-impact distances and then used a linear momentum in-line collision formula to determine a speed for the Chevrolet Corvette. Based on these findings and his training, experience, and knowledge, Officer Cisneros determined the Corvette was traveling roughly 104 miles per hour at impact. The trial court overruled Appellant's objection to Officer Cisneros' testimony, but allowed Appellant's counsel to further voir dire Officer Cisneros outside the jury's presence.

In voir dire, Officer Cisneros testified that the measurements used in calculating the skid speed and linear momentum in-line collision formulas were taken with a surveying instrument called an Accident Investigation Measuring System ("AIMS"). Officer Cisneros explained that operation of the AIMS device consists of setting up the equipment and from that initial point, taking shots by aiming the equipment at the particular target you want. The device has a prism that shoots a laser beam to the prism at the target, which shoots it back and gives you the measurement. Officer Cisneros conceded that he could not explain in any detail the scientific principles involved in this type of measuring system. Officer Cisneros stated that his department has two AIMS equipment, which were recently checked for calibration by the manufacturer, but he did not know the last time the AIMS device he used was calibrated. Officer Cisneros also conceded that he did not know whether or not the accuracy of AIMS results could be validated over and over again by someone who is an expert in the underlying scientific principles of this measuring machine.

Regarding the formulas used in his calculations, Officer Cisneros testified that he obtained the measurements used in the formulas by using the AIMS machine. The formulas were taught to him during the courses mentioned above. Officer Cisneros explained that the formulas are used internationally by other law enforcement agencies, including the Department of Public Safety in Texas. Officer Cisneros, however, conceded that he did not know who devised the formulas and did not know the scientific principles underlying the values in the formulas.

At the conclusion of the hearing, Appellant's counsel renewed his objection to Officer Cisneros' testimony. In response, the State argued that the AIMS system and formulas have been judicially accepted and noted that the officer testified that the AIMS system is used by other departments. It further noted that there have been no problems with it when used before. The trial court overruled Appellant's objection and allowed the State to offer the officer's expert witness concerning the speed of the Corvette and that of the other vehicle at the time of the collision.

*Qualifications*

 As the party offering Officer Cisneros' testimony, the State had the burden of showing he qualified as an expert on speed based on his accident reconstruction background. *See Penry*, 903 S.W.2d at 762. Police officers are qualified to testify regarding accident reconstruction if they are trained in the science about which they will testify and possess a high degree of knowledge sufficient to qualify as an expert. *DeLarue v. State*, 102 S.W.3d 388, 396 (Tex.App.-Houston [14th Dist.] 2003, no pet.).

Here, Officer Cisneros testified that he has been a police officer with the El Paso Police Department for twenty years. Since April 1994, he has been assigned to the special traffic investigations section. Officer Cisneros has received basic, inter-

mediate, and advanced training in accident reconstruction, including speed reconstruction. In addition, Officer Cisneros has eighty hours of accident reconstruction training held at the Bexar County Sheriff's Department in 1997. On many occasions he has done accident reconstruction for the special traffic investigations section. Officer Cisneros has been certified twice as an expert in accident reconstruction by El Paso district courts. For this case, Officer Cisneros was called out to Gateway West on June 17, 2001 and performed an accident reconstruction of the incident. Officer Cisneros clearly demonstrated he had special knowledge on accident reconstruction, including speed reconstruction, based on his extensive training and his field experience. Therefore, we conclude the trial court did not abuse its discretion in determining Officer Cisneros was qualified to offer his expert opinion in speed reconstruction.

### Reliability

█ The State in this case does not dispute that accident reconstruction, specifically Officer Cisneros' testimony concerning the speed at which Appellant was driving at the time of impact, is a type of scientific evidence subject to *Kelly* requirements for admissibility. By clear and convincing evidence, the State was required to show that with respect to the scientific evidence in this case: (1) the underlying scientific theory was valid; (2) the technique applying the theory was valid; and (3) the technique was properly applied on the occasion in question.[1] *See Kelly*, 824 S.W.2d at 573.

Appellant argues on appeal that the State presented no evidence concerning the reliability of the "AIMS test." By Appellant's complaint we understand him to be challenging the reliability of AIMS equipment-derived distance measurements and the reliability of the speed calculation formulas used by Officer Cisneros in his speed reconstruction analysis.

█ Here, Officer Cisneros testified that the formulas he used in deriving Appellant's driving speed are also used by other law enforcement agencies. Officer Cisneros, however, conceded that he did not know the scientific principles underlying the values in the formulas used to derive Appellant's speed at the time of impact. He could not explain the underlying scientific principles of how the AIMS equipment provided distance measurements and he did not know whether or not the accuracy of AIMS results could be validated over and over again. In this case, there is no evidence in the record sufficient to satisfy the reliability requirements pursuant to *Kelly*. Therefore, the trial court erred in admitting the evidence concerning Appellant's driving speed. We find, however, that in this case, admission of Officer Cisneros' testimony concerning Appellant's driving speed at the time of impact was harmless.

█ A nonconstitutional error that does not affect the substantial rights of the defendant must be disregarded. *See* Tex. R.App.P. 44.2(b). A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex.Crim.App.1997). A criminal conviction should not be overturned for nonconstitutional error if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury or had but a slight effect. *Johnson v. State*, 967 S.W.2d 410, 417 (Tex.Crim.App.1998).

1. In his sole issue, Appellant does not challenge Officer Cisneros' testimony concerning the Corvette's speed on relevancy grounds. Therefore, we will address its reliability only.

In this case, Appellant pled guilty and was convicted of intoxication manslaughter.[2] A person commits the offense of intoxication manslaughter if the person: (1) operates a motor vehicle in a public place; (2) is intoxicated; and (3) by reason of that intoxication causes the death of another by accident or mistake. *See* Tex. Pen.Code Ann. § 49.08(a)(Vernon 2003). The contested issue at trial was whether Appellant used or exhibited a deadly weapon: to wit a motor vehicle in commission of the offense. A deadly weapon is defined as "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." Tex.Pen.Code Ann. § 1.07(a)(17)(B)(Vernon 2003). Anything, including a motor vehicle, which is actually used to cause the death of a human being is a deadly weapon. *Tyra v. State,* 897 S.W.2d 796, 798 (Tex.Crim.App. 1995). This is necessarily so because a thing which actually causes death is, by definition, "capable of causing death." *Id.*

The evidence shows that Appellant was driving in excess of 60 miles per hour as he passed Zachary Valenzuela and approached the Lee Trevino Gateway West intersection. Mr. Valenzuela did not see Appellant attempt to brake prior to the accident and witnesses testified that the intersection was well-lit and the roadway was dry. Physical evidence and witness testimony indicated that the front of Appellant's vehicle collided with the rear end of the victims' vehicle, causing their vehicle to go airborne and spin around to face oncoming traffic. Through her rearview mirror, Veronica Huerta Garcia saw Appellant's vehicle slam against the guardrail at a high speed, causing sparks to fly. In unchallenged testimony, Officer Cisneros testified that he found no pre-impact brake marks and no pre-impact skid marks at the accident scene. El Paso County Medical Examiner Dr. Juan Contin testified that the passenger victim bled to death from a torn aorta, resulting from the collision. Dr. Contin also testified that the driver victim died the following day in the hospital from injuries sustained in the collision.

After examining the record as a whole, we find the evidence above was sufficient to support the jury's affirmative finding that Appellant used his motor vehicle in a manner that was capable of causing death or serious bodily injury, without considering the speed evidence introduced through Officer Cisneros' testimony. The trial court's erroneous admission of the speed evidence did not affect Appellant's substantial rights and in light of other properly admitted evidence we are assured that if its admission influenced the jury at all, it did so only slightly. Therefore, we find the trial court's error to be harmless. Issue One is overruled.

Accordingly, we affirm the trial court's judgment.

McCLURE, J., Concurring.

---

2. The first count of intoxication manslaughter in the indictment alleged Appellant:

> [D]id then and there, by accident or mistake, while operating a motor vehicle in a public place while intoxicated, to wit: by having an alcohol concentration of .08 or more, and by reason of that intoxication caused the death of MARIO SANDOVAL by then and there driving said motor vehicle into and causing it to collide with a motor vehicle in which MARIO SANDOVAL was a passenger....

The second count of intoxication manslaughter alleged Appellant:

> [D]id then and there, by accident or mistake, while operating a motor vehicle in a public place while intoxicated, to wit: by having an alcohol concentration of .08 or more, and by reason of that intoxication caused the death of ROBERT SANDOVAL by then and there driving said motor vehicle into and causing it to collide with a motor vehicle driven by ROBERT SANDOVAL....

ANN CRAWFORD McCLURE, J., Concurring.

The record shows that Appellant waived his complaint about the AIMS device and the measurements derived from it. Therefore, I disagree with the majority's conclusion that the trial court abused its discretion by admitting this particularly testimony. Alternatively, I would find that the State is not required to prove the scientific principles pertaining to the AIMS device in order for an expert to rely on measurements taken with the device. While I agree with the majority's holding that the State failed to carry its burden under *Kelly* with respect to Cisneros' expert opinion as to the pre-impact speed of Appellant's vehicle, I write separately to discuss the effect of *Hernandez v. State*, 116 S.W.3d 26 (Tex.Crim.App.2003) on an appellate court's review of this issue. Because the majority opinion ultimately concludes that the errors in admitting the expert testimony is harmless, I concur.

Cisneros utilized two formulas in estimating the speed at which Appellant's car was traveling at the time of impact: the skid speed formula and the linear momentum in-line collision formula. These formulas are used not only by the Texas Department of Public Safety but also internationally by other law enforcement agencies and they were taught to Cisneros at the accident investigation and accident reconstruction courses he attended as part of his training. Pursuant to his training, Cisneros gathered data relevant to the following formula components:

1. weight of the vehicles;
2. the coefficient of friction or drag factor; and
3. the post-impact distances of the vehicles.

Cisneros obtained the weight of the vehicles involved in the accident from the Department of Motor Vehicles. The drag factor pertains to the friction of the roadway and Cisneros obtained this figure by utilizing a drag sled to find a coefficient of friction for the particular road involved in the accident. For the third factor, Cisneros utilized the AIMS device to measure the distances traveled by the two vehicles after impact. A diagram prepared by Cisneros (State's Exhibit 10) shows that Appellant's vehicle traveled 413 feet from the point of impact to its resting place. There were no pre-impact skid marks because Appellant's vehicle did not skid prior to striking the complainants' car. Consequently, Cisneros utilized the skid speed formula to determine only a post-impact speed for each vehicle involved in the accident.

As explained by Cisneros, the skid speed formula involves multiplying distance by a constant of thirty by the square root of the roadway drag factor. Cisneros determined that the complainants' Honda went from 0 miles per hour to a post-impact speed of 28 miles per hour. Cisneros was not asked to state the post-impact speed he determined for the Corvette but he included the figure in a written expert's report filed in the case.[1] With the post-impact speeds determined by the skid speed formula, Cisneros then applied the weights of the vehicles in the linear momentum in-line collision formula in order to obtain the speed of the initial impacting vehicle. Based on this formula, Cisneros estimated that Appellant's Corvette was traveling 104 miles per hour at the point of impact. Cisneros explained the components of the skid speed formula but was not asked to explain the linear momentum in-line collision formula.

1. Cisneros' written report was not admitted into evidence.

## Waiver of Complaint About Measurements

The majority has failed to consider that Appellant waived any complaint about Cisneros' use of the AIMS device to obtain the measurements used in the speed calculation formulas because Appellant did not object to State's Exhibit 10, which is a diagram of the collision including measurements taken at the scene with the AIMS device. It is well established that a party must make a timely and specific objection in order to preserve his complaints for appellate review. *See* TEX.R.APP.P. 33.1. Further, a party must object every time inadmissible evidence is offered or the complaint is waived. *See Ethington v. State*, 819 S.W.2d 854, 858 (Tex.Crim.App. 1991); *Gillum v. State*, 888 S.W.2d 281, 285 (Tex.App.-El Paso 1994, pet. ref'd). In the presence of the jury, the State elicited testimony from Cisneros showing that he had training in accident reconstruction and had previously testified as an expert on that topic. Cisneros then identified State's Exhibit 10 as a diagram of the accident which he prepared on the night of the accident. Cisneros explained that he used the Accident Investigation Measuring System (AIMS), which he described as a surveying device, and a software program to prepare State's Exhibit 10. The State then offered State's Exhibit 10 and Appellant's counsel stated that he had no objection to it. State's Exhibit 10 depicts the point of impact and post-impact locations of the vehicles, their direction of travel, the location of various skid marks, and measurements of those skid marks taken by Cisneros using AIMS. The exhibit reflects that Appellant's Corvette traveled 413 feet from the point of impact with the complainants' Honda. By failing to object to the initial testimony about the AIMS device and State's Exhibit 10, Appellant waived any subsequent complaint he might have had about the measurements taken by Cisneros with the assistance of the AIMS device.

## Scientific Validity of AIMS

Even if Appellant did not waive his complaint about the measurements and the AIMS device, the majority opinion errs by holding that the State was obligated to establish that Cisneros understands the inner-workings of this surveying device. Cisneros was offered as an expert in accident reconstruction, not as an expert in AIMS equipment. Consequently, there was no necessity for the State to prove that he understood exactly how laser measuring devices and surveying equipment work. As aptly noted by appellate counsel for the State, the AIMS device is essentially a high-tech tape measure and Cisneros used the device to measure the distance between two points. I find no requirement in Rule 703 or elsewhere that an expert witness be able to explain the scientific principles involved in every piece of equipment used by the expert to gather data. To illustrate this point, an expert who relies on photographs as part of the foundation for his opinion regarding the cause of an accident need not explain precisely how a camera works in order to rely on the data supplied by the photographs. Likewise, an expert witness who utilizes a calculator in performing calculations is not required to relate to the jury the scientific principles involved in an electronic calculator before his expert testimony is permitted. Cisneros sufficiently explained that the AIMS device, using a laser, measured the distance Appellant's car traveled from the point of impact to its resting place and he utilized that measurement in the skid speed formula. For these reasons, I would find that the trial court did not abuse its discretion in admitting Cisneros' testimony about the measurements taken at the scene of the accident.

*Reliability of the Speed Calculation Formulas*

While I would find much of Cisneros' testimony admissible, the State failed to offer sufficient evidence proving the reliability of the two formulas utilized by Cisneros to estimate speed. A party seeking to introduce evidence of a scientific principle need not always present expert testimony, treatises, or other scientific material to satisfy the *Kelly* test. *Hernandez*, 116 S.W.3d at 28–9. It is only at the dawn of judicial consideration of a particular type of forensic scientific evidence that trial courts must conduct full-blown "gatekeeping" hearings under *Kelly*. *Id.* at 29. Once a scientific principle is generally accepted in the pertinent professional community and has been accepted in a sufficient number of trial courts through adversarial *Daubert/Kelly*[2] hearings, courts subsequently considering the issue may take judicial notice of the scientific validity (or invalidity) of that scientific theory based upon the process, materials, and evidence produced in the prior hearings. *Id.* at 29; *see Weatherred v. State*, 15 S.W.3d 540, 542 n. 4 (Tex.Crim.App. 2000)("once a particular type of scientific evidence is well established as reliable, a court may take judicial notice of that fact, thereby relieving the proponent of the burden of producing evidence on that question"). In other words, trial courts are not required to reinvent the scientific wheel in every trial. *Hernandez*, 116 S.W.3d at 29. The Court of Criminal Appeals has recently emphasized, however, that some trial courts must conduct an adversarial gatekeeping hearing to determine the reliability of the given scientific theory and its methodology before other trial courts may take judicial notice of that determination. *Id.* Although appellate courts may likewise take judicial notice of other appellate opinions concerning a specific scientific theory or methodology in evaluating a trial court's *Daubert/Kelly* gatekeeping decision, judicial notice on appeal cannot serve as the sole source of support for a bare trial court record concerning scientific reliability. *Hernandez*, 116 S.W.3d at 31–2.

Although the trial court held a *Daubert/Kelly* hearing in the instant case, the State did not offer any evidence of the theories underlying the formulas utilized by Cisneros. Further, the State did not show that the issue of the formulas' reliability has been litigated previously nor did it ask the trial court to take judicial notice of the reliability of the scientific theory and methodology based upon prior hearings or prior appellate decisions. *See Hernandez*, 116 S.W.3d at 30 and n. 7. There is evidence that Cisneros has previously qualified as an expert and testified regarding accident reconstruction and perhaps even speed estimation, but the fact that a trial court has allowed some type of scientific testimony by a particular witness previously does not mean that the witness's testimony is, *ipso facto*, scientifically reliable. *Hernandez*, 116 S.W.3d at 30.

The trial court's decision to admit this evidence is understandable as expert testimony regarding accident reconstruction and speed estimation has been previously admitted in Texas civil and criminal cases. *See e.g., Chavers v. State*, 991 S.W.2d 457, 460–61 (Tex.App.-Houston [1st Dist.] 1999, pet. ref'd); *Trailways, Inc. v. Clark*, 794 S.W.2d 479, 483 (Tex.App.-Corpus Christi 1990, writ denied); *Rogers v. Gonzales*, 654 S.W.2d 509, 512 (Tex.App.-Corpus Christi 1983, writ ref'd n.r.e.); *Bates v.*

**2.** *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

*Barclay,* 484 S.W.2d 955, 957–59 (Tex.Civ. App.-Beaumont 1972, writ ref'd n.r.e.); *Adams v. Smith,* 479 S.W.2d 390, 395 (Tex. Civ.App.-Amarillo 1972, no writ); *Beynon v. Cutberth,* 390 S.W.2d 352, 355–56 (Tex. Civ.App.-Eastland 1965, no writ). With the exception of *Chavers,* these decisions pre-date *Daubert* and *Kelly,* and there is no determination in any of the cases that the formulas used to calculate speed are scientifically reliable. Although *Chavers* employs the proper criteria under *Kelly,* the decision is distinguishable because the expert witness based his calculations on yaw marks rather than the two formulas used by Cisneros. Therefore, taking judicial notice of *Chavers* is of no benefit in the instant case.

In *Thomson v. Rook,* a United States District Court conducted a *Daubert* hearing to determine the admissibility of an accident reconstruction expert's opinion regarding speed, distance traveled by vehicles, and the point of impact of the collision. *Thomson v. Rook,* 255 F.Supp.2d 584, 584–87 (E.D.Tex.2001). That court determined that the articles, books, and other experts in the accident reconstruction field validated the methodology used by the expert witness for calculating speed, distance traveled by the vehicles, and the point of impact. *Id.* at 586. In a footnote, the court noted that the expert witness calculated speed using a "standard physics equation employed by automobile accident reconstruction experts and a coefficient of friction derived from J. Stannard Baker's book, *Traffic Investigation Manual.*" *Id.* at 586 n. 5. The witness calculated speed and distance traveled by one of the vehicles using a standard rate of acceleration from a standard start as reported by the Baker book. *Id.* The district court admitted the witness's expert opinion on these topics but excluded the witness's opinion about the driver's braking time because the plaintiffs had not produced

evidence or articles or books, or other experts that validate the methodology used by the expert witness. *Id.* at 587. It is impossible to determine whether Cisneros used some of the same formulas as the witness in *Thomson,* and therefore, taking judicial notice of this decision would not benefit the State.

I have been unable to find any Texas appellate decisions at the state or federal level holding that the skid speed formula and linear momentum formulas utilized by Cisneros are reliable.

A cursory review of appellate decisions from other jurisdictions indicates that this type of expert testimony has been often admitted into evidence in other states. *See e.g., State v. Russo,* 38 Conn.Supp. 426, 450 A.2d 857, 866–67 (1982)(holding that an expert in Connecticut may testify as to the speed of a motor vehicle based on skid marks and other factors because the formulas used to calculate speed are based on well-recognized principles of physics that have gained general acceptance in the field of accident reconstruction); *Bryant v. Buerman,* 739 So.2d 710, 712–13 (Fla.Dist.Ct.App.1999)(holding that opinion of an accident reconstruction expert witness regarding the speed of a vehicle at the time of an accident is admissible in personal injury action arising out of collision, so long as the expert's testimony is helpful to the jury). *See also* Jerre E. Box, Annotation, *Opinion Testimony as to Speed of Motor Vehicle Based on Skid Marks and Other Facts,* 29 A.L.R.3d §§ 248–77 (1970 & Supp.1996)(discussing numerous decisions admitting and excluding this type of evidence). As is the case with the Texas decisions discussed above, many of the out-of-state decisions pre-date *Daubert* and *Kelly,* and of those cases decided since *Daubert* and *Kelly,* the opinions do not discuss reliability of the same formulas used by Cisneros. Further, none

of these decisions indicates that the formulas utilized by Cisneros have become so widely accepted or persuasively proven that future courts may take judicial notice of their reliability. *See Hernandez*, 116 S.W.3d at 29 n. 6. The Connecticut Supreme Court stated in *Russo* that using the coefficient of friction to estimate speed is a well recognized principle that has gained general acceptance in the field of accident reconstruction. *Russo*, 450 A.2d at 866. While Cisneros utilized the coefficient of friction in the skid speed formula to determine post-impact speed, he used a different formula to obtain pre-impact speed and that is the object of Appellant's complaint on appeal. Moreover, the Court of Criminal Appeals cautioned in *Hernandez* about reliance on judicial opinions from non-Texas jurisdictions because many other jurisdictions utilize the "preponderance of the evidence" standard rather than the "clear and convincing" evidence standard required in Texas. *Hernandez*, 116 S.W.3d at 31 n. 13.

In the absence of any evidence showing the reliability of the speed calculation formulas utilized by Cisneros, the trial court erred in admitting Cisneros' conclusion that Appellant's vehicle was traveling 104 miles per hour at the point of impact. However, I would also find the error harmless as stated in the majority opinion. With these additional comments and observations, I concur in the judgment affirming the trial court's judgment.