COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

|  | § |  |
|---|---|---|
| PATRICK EVANS, | | No. 08-07-00213-CR |
| | § | |
| Appellant, | | Appeal from |
| | § | |
| v. | | Criminal District Court No. 2 |
| | § | |
| THE STATE OF TEXAS, | | of Tarrant County, Texas |
| | § | |
| Appellee. | | (TC # 0989458D) |
| | § | |

**O P I N I O N**

Patrick Evans appeals his criminal prosecution for capital murder. A jury found him guilty and sentenced him to life in prison. For the reasons that follow, we affirm.

**FACTUAL SUMMARY**

Melvyn Williams died of multiple gunshot wounds to the head. The forensic pathologist testified that the manner of death suggested an execution-style murder. The significant facts in the case are controverted.

Wanda Williams[1] is the mother of Mercutio "Kee Kee" Howard and the sister of Shirley Tolliver. She testified that Kee Kee and Appellant were long-time friends. Wanda had a house located at 5416 Purington in Fort Worth, Texas, but she provided live-in care for her grandmother at the City View Apartments. Wanda found Melvyn's body in the storage shed at the Purington address.

Wanda's involvement began when she received a telephone call from Appellant informing

---

[1] Wanda Williams is not related to the decedent.

her that he was coming to Fort Worth. She told Kee Kee of Appellant's plans. The next morning, Wanda's nephew, Joseph Tolliver, entered her bedroom at the City View Apartments and awakened her. When he told her there was a body at her house, Wanda jumped up, grabbed her keys, and drove to the Purington address. She noticed drops of blood on the sidewalk as she walked up the driveway. She entered the house through the back door, walked into the backyard, and discovered the body. She then contacted a United States Marshall who was a friend of her sister.

*Kee Kee's Version of Events*

Kee Kee testified that he met Appellant in high school and they had known each other for more than ten years. Kee Kee explained that Appellant had moved from Fort Worth to Houston, but he would periodically travel to Fort Worth to visit his friends. When his mother related that Appellant was coming to Fort Worth, Kee Kee thought it was odd because Appellant had been to Fort Worth only a few days before. Kee Kee detailed his telephone conversation with Appellant:

> When I walked in the house and the phone was ringing and I picked it up. And [Appellant] had told me that he was on his way down here and he had a dead body in the trunk. I said: Man, come on. I didn't believe that right there. So then that's when he told me that he was bringing his cousin down here from college. So I believed that. I told him: Well, just meet me at my house [5416 Purington].

Kee Kee and Appellant met at the Purington address. Kee Kee's friend, Courtney Davis, was with him when Appellant arrived in his black Intrepid. Appellant had marijuana, a big bag of cocaine, prescription drugs, a revolver, and some type of handgun with a pearl handle. Kee Kee testified that when he and Appellant were alone, Appellant described how he murdered Melvyn:

Q. While they [Joseph Tolliver and Courtney Davis] were gone who was left at the house?

A. Just me and [Appellant].

Q. What happened while they were gone?

A.    We was talking and that's when he told me how he did it.

Q.    What did he say?

A.    He said he had -- he said he had went up there and it was unusual for whoever this guy is to be up in the house by his self. So some way he got him to come out and get in the car.

Q.    What car?

A.    In his black Intrepid.

Q.    What happened?

A.    He say he got him to come out there and get in the car. And the guy was sitting on the passenger's side. And he asked him -- some way he got a gun. I don't know where the gun, how Patrick got the gun or whatever. I don't I don't know that. But anyway he told the dude to get something out of the glove compartment. And he said when the dude reached to get something out of the glove compartment he shot him in the head.

Q.    Did he say who this guy was?

A.    He didn't tell me no name.

Q.    To this day do you know the guy's name?

A.    No. I don't know what he looked like or nothing.

Q.    Okay. Where did he say this happened?

A.    In Houston in some apartment complex.

Q.    Okay. How did he tell you that he ended up with all the guns and drugs?

A.    Because he said he shot the guy and he went back up in the apartment and got everything and put it in the car.

Q.    So the guns -- the guns and the drugs came from inside the apartment?[2]

---

[2]  According to the record, there were thirty pounds of marijuana and 156 grams of cocaine.

A.      Yes.

Q.      Were they [Appellant's] guns and drugs?

A.      I'm assuming they was whoever that guy was up in there.

Appellant, Kee Kee, Courtney, and Joseph all participated in moving Melvyn's body from the trunk of Appellant's car to the shed. They then consumed a considerable amount of the drugs that Appellant had taken from Melvyn. The next morning, Kee Kee accompanied Appellant to a local Home Depot where Appellant purchased a chain saw, gloves, and trash cans. Appellant planned to dispose of Melvyn William's body by dismembering it with the chain saw and throwing away the body parts so they could not be identified. But Joseph told his Aunt Wanda about the body and she contacted the authorities. The police arrived before the victim's body was dismembered. A police chase ensued, and Appellant, Joseph, Courtney, and Kee Kee were arrested.

*Appellant's Version of Events*

Appellant denied killing Melvyn. He did know the victim, he knew Melvyn was a drug dealer, and he had partied with him. At some point prior to the murder, Kee Kee, Wanda, and Shirley Tolliver visited Houston. Appellant took Kee Kee around the music scene and introduced him to Melvyn. Kee Kee and Melvyn talked privately for over an hour, but Appellant did not know the details of the conversation.

Shortly before he disappeared, Melvyn asked Appellant for a ride to the Greens Point area on the north side of Houston. Appellant last saw Melvyn talking to some guys in a blue Caprice. Melvyn waved at Appellant to go ahead and leave. Appellant then went home, where he learned that his grandmother had become very sick in Fort Worth. He then threw some clothes in a bag and left. He arrived in Fort Worth around 4 or 5 p.m. that afternoon. He met Kee Kee at Wanda's house, and then allowed Joseph and Courtney to use his car. The two were gone approximately twenty to

twenty-five minutes. Then Appellant, Kee Kee, Joseph, and Courtney drove to City View to his grandmother's apartment. Kee Kee asked to use Appellant's car. Kee Kee, Courtney, and Joseph left while Appellant stayed to visit his grandmother. Appellant testified that the three men were gone about two hours and that when they returned, he noticed that they had all changed clothes.

At around 9 or 10 p.m., Appellant and Kee Kee drove to Teleishea's house. According to Appellant, Kee Kee pulled a gun out while they were sitting at the table. They went into a back room to hide the gun, and Kee Kee revealed he had another gun and some prescription drugs. Appellant grabbed the guns and placed them in a box in the closet. While Appellant was panicking over the guns, Kee Kee pulled out a bag of cocaine from his pocket and snorted some off of a plate he had picked up in the kitchen. Appellant told Kee Kee to put all of his stuff on top of some boxes in the closet, and Appellant walked out of the room. The two then left for Wanda's apartment at City View.

Once Appellant and Kee Kee returned to Wanda's house, they discovered someone had broken into the garage and trashed Kee Kee's car. Appellant claimed he told Kee Kee to call the police, but Kee Kee told him not to worry about it. Appellant found this unusual. Kee Kee then asked Appellant to run him over to Home Depot, where Kee Kee bought some trash cans, a chain saw, and some gloves that Kee Kee said he needed to clean up the backyard. Appellant drove Kee Kee back to the Purington house and Kee Kee took the items out of the car. By now, it was early Friday, August 5, 2005. Kee Kee asked to borrow Appellant's car, leaving Appellant at the house. According to Appellant, Kee Kee was gone fifteen or twenty minutes. Later, Appellant and Kee Kee again ended up at City View where Courtney's brother, Michael Howard, borrowed Appellant's car. Appellant then headed for Purington in Michael Howard's car with Kee Kee and Courtney as passengers. When Appellant turned off of Lancaster, Kee Kee suddenly asked him to

stop. Appellant parked the car, and Kee Kee jumped out and ran toward the backyard of a house. After less than two minutes, Kee Kee climbed into the car and told Appellant to drive back toward Lancaster. Shortly thereafter, Appellant heard sirens. Appellant slowed down and began to pull to the right lane, but Kee Kee yelled, "Go, go, go." When Appellant realized the police car wasn't going around them and was instead following them, he asked Kee Kee why the law was chasing them, and Kee Kee's response was, "You don't want to know, man. Just go. Just go." Appellant was concerned about leaving the scene of an accident, but Kee Kee was yelling at him and told him, "You better go. They're going to charge us all with murder." Kee Kee told Appellant that he was referring to Appellant's "homeboy" from Houston.[3] Appellant claims he still had no idea what Kee Kee was talking about and didn't know anybody was dead until Saturday, August 6, 2005. Appellant panicked when Kee Kee told him they were going to be charged with murder, and he slammed on the brakes, hitting a curb, causing the vehicle to flip over.

---

[3] In its brief, the State surmises that Appellant wanted the jury to infer that during the two-hour period that Kee Kee, Courtney, and Joseph had his car, "they went to Houston, picked up Melvyn Williams, murdered him, and brought back his body in the trunk of the vehicle."

**SUFFICIENCY OF THE EVIDENCE**

In Points of Error One and Two, Appellant challenges the legal and factual sufficiency of the evidence to sustain the capital murder conviction, rather than a murder conviction followed by a burglary.

*Standard of Review*

In reviewing the legal sufficiency of the evidence to support a criminal conviction, we must review all the evidence, both State and defense, in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979); *Geesa v. State*, 820 S.W.2d 154, 159 (Tex.Crim.App. 1991). This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789, 61 L.Ed.2d at 573. We do not resolve any conflict of fact or assign credibility to the witnesses, as it was the function of the trier of fact to do so. *See Adelman v. State*, 828 S.W.2d 418, 421 (Tex.Crim.App. 1992); *Matson v. State*, 819 S.W.2d 839, 843 (Tex.Crim.App. 1991). Instead, our duty is only to determine if both the explicit and implicit findings of the trier of fact are rational by viewing all of the evidence admitted at trial in a light most favorable to the verdict. *Adelman*, 828 S.W.2d at 422. In so doing, any inconsistencies in the evidence are resolved in favor of the verdict. *Matson*, 819 S.W.2d at 843. Further, the standard of review is the same for both direct evidence and circumstantial evidence cases. *Geesa*, 820 S.W.2d at 158-59.

When conducting a review of the factual sufficiency of the evidence, we consider all of the evidence, but we do not view it in the light most favorable to the verdict. *Clewis v. State*, 922

S.W.2d 126, 129 (Tex.Crim.App. 1996); *Levario v. State*, 964 S.W.2d 290, 295 (Tex.App.--El Paso 1997, no pet.). We review the evidence weighed by the jury that tends to prove the existence of the elemental fact in dispute and compare it with the evidence that tends to disprove that fact. *Johnson v. State*, 23 S.W.3d 1, 7 (Tex.Crim.App. 2000); *Jones v. State*, 944 S.W.2d 642, 647 (Tex.Crim.App. 1996), cert. denied, 522 U.S. 832, 118 S.Ct. 100, 139 L.Ed.2d 54 (1997). A defendant challenging the factual sufficiency of the evidence may allege that the evidence is so weak as to be clearly wrong and manifestly unjust, or in a case where the defendant has offered contrary evidence, he may argue that the finding of guilt is against the great weight and preponderance of the evidence. *See Johnson*, 23 S.W.3d at 11. Although we are authorized to set aside the fact finder's determination under either of these two circumstances, our review must employ appropriate deference and should not intrude upon the fact finder's role as the sole judge of the weight and credibility given to any evidence presented at trial. *See Johnson*, 23 S.W.3d at 7. We are not free to reweigh the evidence and set aside a verdict merely because we feel that a different result is more reasonable. *Cain v. State*, 958 S.W.2d 404, 407 (Tex.Crim.App. 1997); *Clewis*, 922 S.W.2d at 135.

*Capital Murder*

A person commits the offense of capital murder if he commits murder as defined by TEX.PENAL CODE ANN. § 19.02(b)(1) and he intentionally commits the murder in the course of committing or attempting to commit robbery. *See* TEX.PENAL CODE ANN. § 19.02(b)(1), 19.03(a)(2) (Vernon 2003). The Penal Code does not define the phrase "in the course of committing or attempting to commit" as used in Section 19.03(a)(2).

The Court of Criminal Appeals has defined the phrase to mean "conduct occurring in an attempt to commit, during the commission, or in the immediate flight after the attempt or commission of the offense." *Garrett v. State*, 851 S.W.2d 853, 856 (Tex.Crim.App. 1993); *Riles v.*

*State*, 595 S.W.2d 858, 862 (Tex.Crim.App. 1980). In *Garrett*, the court determined that in order for murder during a robbery to qualify as capital murder, the intent must be formed prior to or concurrent with the murder. *Garrett*, 851 S.W.2d at 856. The court reached this conclusion because the point at which the defendant formulates his intent to take the victim's property is critical to differentiating, in the abstract, between the defendant's commission of capital murder in the course of committing robbery and his commission of first-degree murder, followed by theft from a corpse, a third-degree felony. *See White v. State*, 779 S.W.2d 809, 815 (Tex.Crim.App. 1989), *cert. denied*, 495 U.S. 962, 110 S.Ct. 2575, 109 L.Ed.2d 757 (1990).

Intent is a fact question for the trier of fact, and it may be inferred from the acts, words, and conduct of the accused. *Manrique v. State*, 994 S.W.2d 640, 649 (Tex.Crim.App. 1999); *Wallace v. State*, 52 S.W.3d 231, 234 (Tex.App.--El Paso 2001, no pet.). As a result of its nature, mental culpability must generally be inferred from the circumstances under which a prohibited act or omission occurs. *Wallace*, 52 S.W.3d at 235; *Robles v. State*, 664 S.W.2d 91, 94 (Tex.Crim.App. 1984).

In *White v. State*, the defendant argued that for his conduct to be "in the course of robbery," the State had to prove that he formed the intent to take the victim's property before he killed her. 779 S.W.2d at 814. White admitted killing the victim and taking her car, but he did not admit killing her before, during, after, or in flight from taking her car and other property. *Id*. The court observed that if White entered the victim's apartment the evening of the murder with the intent to take possessions from the apartment or her car after he raped and/or killed her, the murder would be clearly in the course of robbery. *Id*. at 815. If he formed the intent to take the victim's car only to escape the scene, then killed his victim to avoid apprehension, the killing would likewise be in the course of robbery. *Id*. The only other hypothesis from the evidence presented was that White

entered the victim's apartment with no thought of the property he had walked around and presumably observed while painting for the three proceeding days, killed the victim for no reason (or in order to prevent her from reporting rape), then only as an afterthought, decided to flee in the victim's car and take some of her property from the apartment as well. *Id.* The court found a rational trier of fact would be justified in rejecting the notion that White spent three days in the victim's apartment, with her personal possessions all about him, and never considered taking any of them until after he killed her the evening of the third day. *Id.*

Here, Appellant argues that there is no evidence that he made the decision to steal the guns and drugs prior to or during the murder. He contends that Kee Kee's testimony makes it just as likely that Appellant's decision to burglarize the apartment was an afterthought. He suggests that this is a case of murder followed by burglary.

Appellant's own testimony established that he knew the victim and that the victim was a drug dealer. Kee Kee testified that Appellant told him it was unusual for Melvyn to be in the house alone and that some how, he got him to come out and get in the car. Appellant also told Kee Kee that he shot Melvyn and went back up to the apartment, took everything, and put it into the car. He boasted to Kee Kee and Joseph that he "hit a lick," which Kee Kee defined as taking something from someone or robbing them. There is evidence that Appellant killed the victim first, then went back to the apartment to steal the drugs and guns. The jury was left to decide whether Appellant formed the intent to rob the victim prior to the murder based on the evidence that Appellant knew the victim, knew the victim was a drug dealer, knew the victim was alone in the house, lured the victim into the car, re-entered the home, and took the drugs and guns. The jury was free to disbelieve that the robbery was merely an afterthought. The circumstantial evidence was sufficient to allow a jury to reasonably conclude that Appellant formed the intent to rob prior to or during the commission of

murder.

Viewing the evidence in the light most favorable to the verdict, we find that the evidence is legally sufficient on all the essential elements as alleged. Viewing the evidence in a neutral light, we recognize the conflicting testimony elicited by Appellant. But the jury could have easily rejected Appellant's version of the events and found that Appellant committed the murder and formed the intent to rob before or during the commission. Because such a conclusion is not contrary to the overwhelming weight of the evidence, it is factually sufficient. We overrule Points of Error One and Two.

### IMPROPER STATEMENTS DURING VOIR DIRE

In Point of Error Three, Appellant complains that the trial judge erred by allowing the State to vouch for the credibility of prosecution witnesses. A trial court has wide discretion to control voir dire and its actions are reviewed for an abuse of discretion. *Thornton v. State*, 994 S.W.2d 845, 852 (Tex.App.--Fort Worth 1999, pet. ref'd). A prosecutor may not convey to the jury during argument that he possesses specialized knowledge or expertise about a contested factual issue in the case. *Jackson v. State*, 17 S.W.3d 664, 675 (Tex.Crim.App. 2000). Such comments pose a danger of influencing the jury's opinion in deciding the issue. *Johnson v. State,* 698 S.W.2d 154, 167 (Tex.Crim.App. 1985), *cert. denied,* 479 U.S. 871, 107 S.Ct. 239, 93 L.Ed.2d 164 (1986); *Boyd v. State,* 643 S.W.2d 700, 707 (Tex.Crim.App. 1983); *Maupin v. State,* 930 S.W.2d 267, 270 (Tex.App.--Fort Worth 1996, pet. ref'd). In evaluating whether the prosecutor interjected his personal opinion into the argument, we must consider the challenged remark in the context in which it appears. *Gaddis v. State,* 753 S.W.2d 396, 398 (Tex.Crim.App. 1988).

During voir dire, the prosecutor stated:

Witnesses, you may not automatically believe or disbelieve any witness based upon

his or her status.  And what that means is you have all kinds of people that come in here to testify.  You have police officers, prostitutes, clergymen, nuns, drug dealers. The State doesn't get to pick the witnesses.  Okay.  *The State puts on the witnesses that we have, provided we believe they're credible*.  [Emphasis added].  You as jurors--

Mr. Burns:     Objection as to what the State believes.  It's a asserting her personal opinion and becoming a character witness for their witnesses.

The Court:     Say it again.

Mr. Burns:     She is asserting her personal opinion, Your Honor.  Becoming a character witness for her witnesses at that point.

The Court:     That's overruled.

Mr. Burns:     Note our exception.

Ms. Minton:    I have a duty not to offer what I believe to be perjured testimony. Okay.  I'm the prosecutor.  That's the way it works.

Okay.  What that means though is you as jurors can believe all of the testimony of a witness, some of the testimony of a witness or none of the witness testimony as a witness.  You're the ones that judge the credibility of that from their demeanor and based on how plausible it is what they're telling. Okay.  That's up to the juror.  Now, what it means though is if a person walks in here with a uniform on, you don't automatically get to believe them before they've opened their mouth.  Once they start telling you their training and their experience and what they do for a living, you may believe that their testimony is going to be more credible.  You may not.  You may have the opposite opinion of police officers.  You may believe that -- when you find out that they're a police officer and believe nothing that he says as the truth.  What it means is that you cannot make that decision based upon their status alone.

If a prostitute walks in here and looks like a prostitute and the first thing out of her mouth is I'm a prostitute, you can't automatically disbelieve because of her occupation.  You have to wait until she talks and you get to hear about her.  You may ultimately determine you don't believe her.  But you may also determine that this is the particular type of person that will be testify in this case.  Okay.  Anybody have any questions? Okay.  Can everybody do that for me?  Can everybody say I'm going to wait and see.  I'm going to listen to what they have to say before I start judging their -- their demeanor or credibility just based on who they are and the types of person -- types of people that they are.

Even if we were to agree that the prosecutor "vouched" for the credibility of the State's

witness, we conclude that error, if any, was harmless. Error that does not affect a substantial right must be disregarded. A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. TEX.R.APP.P. 44.2(b); *King v. State,* 953 S.W.2d 266, 271 (Tex.Crim.App. 1997), *citing Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946). If the error had no influence or only a slight influence on the verdict, it is harmless. *Johnson v. State,* 967 S.W.2d 410, 417 (Tex.Crim.App. 1998). If we are unsure whether the error affected the outcome, we should treat it as harmful. *Webb v. State,* 36 S.W.3d 164, 182 (Tex.App.--Houston [14th Dist.] 2000, pet. ref'd). Neither party has the burden of proof under Rule 44.2(b). *Id.* Instead, we will examine the record for purposes of determining harm. *Id.*

We utilize a three-pronged test to determine harm: (1) the severity of the conduct as evidenced by the prosecutor's argument (the magnitude of the prejudicial effect of the prosecutor's remarks); (2) the measures adopted to cure the misconduct, that is, the effect of any cautionary instruction given by the court; and (3) the certainty of conviction absent the misconduct. *Martinez v. State,* 17 S.W.3d 677, 692-93 (Tex.Crim.App. 2000), *citing Mosley v. State,* 983 S.W.2d 249, 259 (Tex.Crim.App. 1998), *cert. denied,* 526 U.S. 1070, 119 S.Ct. 1466, 143 L.Ed.2d 550 (1999).

Viewing the record as a whole, we conclude that the prosecutor's comments did not have a substantial or injurious effect on the jury's verdict. *See King,* 953 S.W.2d at 271. After the court overruled Appellant's objection, the prosecutor immediately informed the venire members that they must ultimately judge the credibility of a witness. There were no similar comments during the trial or during closing arguments. There is nothing to indicate that the panel as a whole or any specific venire member was affected by the prosecutor's comments or that the comments impacted the verdict. The State presented multiple pieces of evidence against Appellant, including the testimony

of Kee Kee Howard, Wanda Williams, and Joseph Tolliver. It produced the murder weapon, the autopsy bullets, the blood and DNA found in Appellant's black Intrepid, and the chemist's testimony linking the DNA to the victim. We overrule Point of Error Three.

## SIXTH AMENDMENT CONFRONTATION CLAUSE

In Point of Error Four, Appellant challenges the admission of a statement made by a non-testifying witness which denied Appellant's right of confrontation. The State responds that Detective McCaskill's testimony was not "testimonial."

*Relevant Facts*

During trial, Detective McCaskill testified that Wanda Williams and Shirley Tolliver came to his office to speak to him. During this meeting, he learned there was a body in a storage shed behind Wanda's home. Defense counsel immediately objected to hearsay and denial of confrontation. The court overruled the objection and allowed Detective McCaskill to proceed.

*Confrontation Clause*

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." In *Crawford v. Washington*, the Supreme Court held that this provision bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." 541 U.S. 36, 53-4, 124 S.Ct. 1354, 1365, 158 L.Ed.2d 177 (2004). The Supreme Court held that only "testimonial statements" caused the declarant to be a "witness" within the meaning of the Confrontation Clause. *See id.*, at 51, 124 S.Ct. at 1364.

In *Davis v. Washington*, the Supreme Court clarified the distinction between testimonial and nontestimonial statements:

Without attempting to produce an exhaustive classification of all conceivable statements--or even all conceivable statements in response to police interrogation--as either testimonial or nontestimonial, it suffices to decide the present cases to hold as follows: Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

547 U.S. 813, 822, 126 S.Ct. 2266, 2273-74, 165 L.Ed.2d. 224 (2006).

*Crawford* involved tape recorded statements by a declarant made during a police interview while *Davis* involved a 9-1-1 call by the declarant detailing a domestic violence dispute. The declarant's interrogation in *Crawford* took place hours after the events she described, but the declarant in *Davis* spoke about events as they actually occurred. The Supreme Court noted that any reasonable listener would recognize that the declarant in *Davis* was facing an ongoing emergency and that the questioning was necessary to resolve it. *Davis*, 547 U.S. at 823. This included the operator's effort to establish the identity of the assailant, so that the dispatched officers might know whether they would be encountering a violent felon. *Id*. Finally, the court noted the difference in formality between the interviews of the *Davis* and *Crawford* declarants. *Davis*, 547 U.S. at 827. In *Crawford*, the declarant responded calmly at the station house to a series of questions, with the officer-interrogator taping and making notes of her answers. *Id*. In *Davis*, the declarant's answers were provided over the telephone, in an environment that was neither tranquil nor safe. *Id*.

We also find guidance in *Langham v. State*, 269 S.W.3d 108, 113 (Tex.App.--Eastland 2008, pet. granted). There, a detective was allowed to testify concerning information provided by a confidential informant. The informant was not "bearing testimony" or making "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact" necessary to the criminal prosecution in the case. *Id*., *citing Crawford*, 541 U.S. at 51, 124 S.Ct. at 1354. Instead,

the primary purpose was to provide sufficient information to the detective so that he could obtain a search warrant. *Id*. These statements were admissible because they were nontestimonial. *Id*. at 114.

Appellant contends this is a classic case of an ongoing emergency because any questioning by Detective McCaskill was conducted to enable police officers to render assistance. The State counters that the two women did not attempt to recount the crime, neither knew what had actually transpired, and they did not implicate Appellant. We agree that the statements were nontestimonial. Wanda and her sister simply relayed information to Detective McCaskill after the shocking discovery of a dead body at Wanda's home. *Davis v. Washington*, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). They did not implicate Appellant in any way. Finding no error, we overrule Point of Error Four.

## EVIDENTIARY ERROR

A trial court's ruling on the admission or exclusion of evidence is reviewed for an abuse of discretion. *Pena v. State*, 155 S.W.3d 238, 243 (Tex.App.--El Paso 2004, no pet.), *citing Montgomery v. State,* 810 S.W.2d 372, 391 (Tex.Crim.App. 1991). An abuse of discretion exists when the trial court's decision is so clearly wrong that it lies outside the zone of reasonable disagreement. *Pena,* 155 S.W.3d at 243-44, *citing Montgomery,* 810 S.W.2d at 391. The trial court abuses its discretion if its decision or action is arbitrary, unreasonable, and made without reference to any guiding rules or principles. *Id.*

### *Photograph of the Victim*

In Point of Error Five, Appellant complains that the trial court erred in admitting a photograph during the guilt phase of the trial. The photo depicts the deceased holding his young niece and was offered as proof of identity. The State replies that Point of Error Five not only fails to contain a clear and concise argument for these contentions, it also fails to cite to the record. We

agree. Moreover, Appellant fails to articulate the exact nature of the prejudice caused by admission of the exhibit. He simply states the "prejudicial effect is enormous." We overrule Point of Error Five as it is improperly briefed. *See* TEX.R.APP.P. 38.1(h); *Whipple v. State*, 281 S.W.3d 482 (Tex.App.--El Paso 2008, pet. ref'd).

*Polygraph Test*

In Point of Error Six, Appellant faults the trial court for not affording him the opportunity to question a State witness who blurted out under cross-examination that he had taken a polygraph. Appellant had wanted to inquire as to the questions asked him by the polygraph operator. To preserve error on appeal, the complaining party must make a timely, specific objection and obtain a ruling on the objection. TEX.R.APP.P. 33.1(a); *see Broxton v. State,* 909 S.W.2d 912, 918 (Tex.Crim.App. 1995). The issue raised on appeal must also comport with the objection made at trial. *Santellan v. State,* 939 S.W.2d 155, 171 (Tex.Crim.App. 1997); *Broxton,* 909 S .W.2d at 918.

During trial, defense counsel cross-examined Joseph Tolliver:

Defense: Part of your deal is that you would have to--have to testify truthfully; is that correct?

Joseph: Yes.

Defense: Who would determine if you were testifying truthfully?

Joseph: I took a polygraph test on the questions that they asked.

State: Your Honor --

Defense: Objection.

The Court: All right.

Defense: Move for mistrial, Your Honor.

The Court: That's denied.

Defense:      I ask--object to the last unresponsive question and ask for a ruling.

State:        Your Honor, I don't believe it was nonresponsive.

Defense:      It was non --

State:        I think he was trying to answer the question.

Defense:      That is -- that's a deal with the State, Your Honor.  And they know better that to do that.  That's --

State:        We didn't.  He did.

The Court:    What are you talking about?

Defense:      To make a -- a -- a-- side-bar remark as she just did.

The Court:    Let's move on. Okay.

Defense:      I want a ruling on my -- my objection.

The Court:    It's overruled.  Let's move on.

Defense:      Note our exception.

              Now then, did the State of Texas talk to you about your testimony, who is going to determine that you're telling the truth?

State:        Your Honor --

The Court:     And that's not even a question.  How would he even --

Defense:      That goes to his mindset, Your Honor.

The Court:    Well, first of all, you're asking for something that a third party might do and I don't think that's a proper question.  So let's have some other questions.

                              .      .      .

Defense:      Object to 38.05, Your Honor.  It clearly goes to intent and motive.

The Court:    I already ruled on that, Let's move on.

At trial, Appellant's objection related to Rule 38.05 of the Texas Code of Criminal

Procedure.  TEX.CODE CRIM.PROC.ANN. art. 38.05 (Vernon 1979).  On appeal, however, he complains that the trial court erred by not allowing him to ask Joseph questions concerning the polygraph exam.  Because Appellant's trial objection does not comport with the argument raised on appeal, the complaint is not preserved for our review.  We overrule Point of Error Six.  Having overruled all issues for review, we affirmed the judgment of the court below.

August 12, 2009

                           ANN CRAWFORD McCLURE, Justice

Before Chew, C.J., McClure, and Carr, JJ.
Carr, J., not participating

(Do Not Publish)