Opinion issued June 19, 2014



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-13-00128-CR

————————————

## ENGIN ATTILA CALBAS, Appellant

## V.

## THE STATE OF TEXAS, Appellee

---

**On Appeal from the 338th District Court**
**Harris County, Texas**
**Trial Court Case No. 1309689**

---

## MEMORANDUM OPINION

This is an intoxication-manslaughter case. The jury found appellant guilty and assessed punishment at twelve years' confinement and a $10,000 fine. We affirm.

# BACKGROUND

Jeff Smith testified that, on the evening of July 10, 2011, he and appellant met at Twin Peaks—a restaurant/bar located at I-45 and Nasa Road 1—for dinner around 9:30 p.m. There was at least an hour-long wait for a dinner table when they got there, so they sat down to have drinks with some friends. According to Smith, during the hour that he and appellant were at Twin Peaks, appellant had two Vodka Red Bulls to drink, and they did not have dinner. At 10:30 p.m., appellant and Smith gave up on a table and drove to another restaurant, Outriggers, to eat. Outriggers was closing when they got there so, instead of eating, appellant followed Smith to Smith's house so that Smith could drop off his truck. Then appellant drove them both to the Turtle Club, a waterfront bar on Nasa Road 1 in Seabrook. Appellant was driving a silver Corvette that belonged to a friend. They arrived at the Turtle Club around 11:15 p.m., and stayed there until it closed at 2:00 a.m.

Smith opened up a tab at the Turtle Club to pay for both his drinks and appellant's drinks. He testified that, based upon that tab and witnessing appellant's drinking, appellant had four Vodka Red Bulls while they were at the Turtle Club. At about 12:30 a.m., they ran into Tina Montana, one of Smith's friends. Tina approached Smith for a ride home because she had been left there by some friends.

2

Her keys, wallet, and cell phone were on the friends' boat. Appellant did not know Tina, but agreed to give her a ride home when they left for the night.

Around 2:00 a.m., Smith closed out his tab and the three of them left. Appellant drove to Smith's house to drop him off first because it was closest. Smith was uncomfortable and did not feel safe during that drive, as appellant was smoking marihuana and "hot rodding it a little bit and showing off," i.e., popping the clutch when leaving a stop sign, spinning the tires, and swerving. Smith asked appellant to stop driving that way, and he did. When they got to Smith's house, Smith got out and appellant drove off with Tina.

Smith testified that appellant then called him at 2:21 a.m. and said he had gotten in a wreck. Smith drove to the site of the wreck, but turned around and drove back home when he saw police there because he knew he had been drinking and should not have been driving. He similarly opined that appellant was too intoxicated to be driving that night.

## A.    The Collision Investigation

Pasadena Police Department Officer B. Wagganer was on patrol in the early hours of July 11, 2011. He testified that while patrolling on eastbound Nasa Parkway, he could hear revving engines when approaching the 4900 block. He then saw a motorcycle speeding westbound in the inside lane and a Corvette "several car lengths behind it" in the outside lane. In Wagganer's opinion, both the

3

motorcycle and the Corvette were driving "well over" the 45-mile-per-hour speed limit. He estimated that they were both driving over 100-miles-per-hour.

After he u-turned and headed back to try to catch them, Wagganer did not see the motorcycle or Corvette, but instead encountered "a bunch of debris in the roadway and dust everywhere . . . indicat[ing] something had crashed." He then discovered the Corvette in the backyard of a nearby residence. The car had crashed completely through the cinderblock wall that surrounded the yard.

When Wagganer approached, he saw appellant standing outside the passenger door "shaking an adult female in the passenger seat, trying to wake her up." Wagganer told him to stop in case she had a neck injury. When Wagganer asked appellant if he was hurt, appellant complained about back pain. According to Wagganer, appellant had "a very strong smell of alcohol beverage on his breath," he was "cursing," and he "had red, watery eyes and thick, slurred speech." Wagganer contacted dispatch to request a DWI Task Force officer and ordered an ambulance and an Accident Reconstruction Team. Wagganer said that he was not able to get a pulse on Tina and saw no sign of life, so he was investigating the scene as a possible fatality.

Wagganer testified that his car has a dash camera that is on all the time. The video from the early morning hours of July 11, 2011 was admitted over appellant's objection, and it shows the motorcycle and Corvette passing Wagganer, but not the

4

accident. Wagganer also has a body microphone that comes on automatically to pick up his conversations. The conversation Wagganer had with appellant was played to the jury and Wagganer testified about some of the content. Because appellant smelled strongly of alcohol, Wagganer asked him how much he had to drink, and appellant responded "two beers." Appellant also told Wagganer that the motorcycle slid toward him, which caused him to swerve and leave the roadway. Wagganer did not believe that was actually what had happened because when he saw the motorcycle and the Corvette, there were four or five vehicle lengths between them. Wagganer testified that appellant later "change[d] his story."

EMS arrived and put appellant on a back board, and he can be heard on the audio tape yelling that his back is hurting. It was later determined that he had broken his back. EMS pronounced Tina deceased and transported appellant to the hospital. The jury was shown and explained numerous admitted pictures of the scene.

Pasadena Police Officer J. Ridings, an accident reconstruction expert, testified about his assessment of the scene. His team concluded that the Corvette was travelling so fast that it was airborne when it struck the cinderblock fence. His analysis of the skid marks showed that the car travelled in a straight line after it began skidding, which would be inconsistent with the driver suddenly swerving to miss hitting something like a motorcycle.

5

Ridings also testified to the results of downloading and analyzing the Corvette's airbag module system. From that data, he testified that five seconds before impact, the car was travelling at 106 miles per hour; it surged to 109 miles per hour four seconds before impact, and then up to 113 miles per hour 3 seconds before impact. He concluded that the car first braked two seconds before impact, which was consistent with the skid marks and the other evidence at the scene.

## B.    The DWI Investigation

Pasadena Police Officer S. Cude testified that, at the time of this accident, he served on the DWI Task Force and had specialized training in investigating intoxication-related offenses. When he arrived at the scene of the accident, appellant was already in the back of the ambulance receiving treatment. Cude started by talking with Wagganer about what Wagganer had observed. Cude then looked around the accident scene and then followed appellant's ambulance to the hospital to continue the investigation. When Cude first observed appellant, he was in a lot of pain and being wheeled into the emergency room. Cude stayed with him, and when there was a lull in the activity of medical providers, Cude spoke with appellant. Cude observed him to have slurred speech and red, bloodshot eyes, both consistent with intoxication and what he had learned from Wagganer.

Given appellant's medical impairment, Cude was only able to perform one of the three standard field sobriety tests, the "horizontal gaze nystagmus" (HGN).

Cude first administered several tests to confirm that appellant was a candidate for the HGN test, and that there were not any conditions that would render any results invalid. Cude then conducted the HGN, and appellant displayed all possible six clues of intoxication. Cude asked appellant whether he had been drinking and whether he had been driving. Appellant admitted to drinking and to driving the silver Corvette.

Cude determined, based upon the totality of the circumstances, his observations, Wagganer's observation, and the results of the HGN test that appellant was intoxicated. He then read him the DIC 24 (DWI statutory warning). At that point, he considered appellant to be in custody for DWI and intoxication manslaughter. After being read the statutory warnings, appellant refused Cude's request that he submit a blood specimen. Cude explained that a blood draw was nonetheless mandatory in this case, because he believed appellant to be intoxicated and because he believed that intoxication had caused Tina's death. He filled out the mandatory blood draw order for the hospital and the nurse drew appellant's blood less than one and a half hours after the accident. Tests on that blood revealed appellant's blood alcohol level to be .142 and detected marihuana in his system.

## C.     The Jury's Verdict and Sentence

The jury found appellant guilty of intoxication manslaughter with a deadly weapon.  Appellant stipulated to being placed on deferred adjudication in 1994 for the felony offense of possession of marihuana and being convicted in 2000 for the misdemeanor offense of possession of marihuana.  During the punishment phase of trial, there was testimony about the impact of Tina's death on her family, including the fact that her youngest two children were now in foster care because there are no family members or friends available to care for them.

Appellant's boss testified that appellant is a good employee and that he would continue to support him with his rehabilitation efforts.  Appellant's mother testified that she depends upon appellant for her care because of her health issues.  Appellant testified to regretting his actions and the consequences.

The jury assessed punishment at 12 years' confinement and a $10,000 fine.

## ISSUES ON APPEAL

Appellant raises the following six issues on appeal:

1. "The trial court committed reversible error by admitting statements made my Appellant while being questioned by Officer Wagganer during a custodial stop."

2. "The trial court committed reversible error by admitting the dash cam video."

3. "The trial court committed reversible error by allowing the State to present multiple, repetitive, and cumulative photographs, the probative values of which were outweighed by being prejudicial, confusing, and misleading to the jury."

4. "The trial court committed reversible error by admitting the Pasadena Police Department Regional Crime Laboratory Report."

5. "The trial court committed reversible error by admitting the Crash Data Retrieval System (CDR), also called the Black Box Recordings."

6. Counsel for the State committed reversible error by stating that the 'Defendant was claiming that a motorcycle had cut him off' after Appellant had asserted his right not to testify at trial."

## ADMISSION OF APPELLANT'S STATEMENTS MADE BEFORE *MIRANDA* WARNINGS

In his first point of error, appellant claims that, when Officer Wagganer asked him how much he had to drink, he was already in custody and thus should have already been read his *Miranda* rights. Accordingly, he asserts, permitting Wagganer to testify about that exchange was error. Relatedly, in his second point of error, he complains that admission of the dash cam video and audio recordings of Wagganer's interactions with him—including the question-and-answer exchange about how much he had to drink—likewise violated *Miranda*.

The State responds that appellant's objections at trial do not comport with these complaints on appeal. In any event, the State argues, the complained-of exchange between appellant and Wagganer occurred within two minutes of Wagganer arriving to investigate the accident scene, and before appellant was detained in any way, so *Miranda* was not implicated. Finally, the State contends

that any error would be harmless, "in light of the wealth of other evidence demonstrating appellant's level of intoxication exceeded the two beers he claimed" in the exchange with Wagganer.

## A.  Applicable Law

The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V.  The warnings set out by the United States Supreme Court in *Miranda v. Arizona* were established to safeguard an uncounseled individual's constitutional privilege against self-incrimination during custodial interrogation. 384 U.S. 436, 442–57, 467–79 (1966).

The Supreme Court has defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444. Unwarned statements obtained as a result of custodial interrogation may not be used as evidence by the State in a criminal proceeding during its case-in-chief. *Id.* Article 38.22 of the Texas Code of Criminal Procedure provides similar limits on the use of custodial statements, requiring "a slightly more elaborate set of warnings than *Miranda*," including the warning that the accused can "terminate the interview at any time." *Wilkerson v. State*, 173 S.W.3d 521, 527 n.14 (Tex. Crim.

10

App. 2005); TEX. CODE CRIM. PROC. ANN. art. 38.22(2)(B)(a)(5) (West Supp. 2013).

For purposes of *Miranda* we apply a "reasonable person" standard—"[a] person is in 'custody' only if, under the circumstances, a reasonable person would believe that his freedom of movement was restrained to the degree associated with a formal arrest." *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996). Our "custody" inquiry also includes an examination of all of the objective circumstances surrounding the questioning. *Herrera v. State*, 241 S.W.3d 520, 525 (Tex. Crim. App. 2007). The subjective belief of law enforcement officials about whether a person is a suspect does not factor into our "custody" determination unless an official's subjective belief was somehow conveyed to the person who was questioned. *Id.* at 525–26 (citing *Stansbury v. California*, 511 U.S. 318, 323–25 (1994)).

### B. Analysis

Appellant emphasizes as significant that, within two minutes of arriving at the accident scene, Wagganer asked appellant "*How much* have you had to drink?" instead of asking him "*if* he had something to drink." In support, appellant cites the following from *State of Texas v. Ortiz*:

> If the officer manifests his belief to the detainee that he is a suspect, then that officer's subjective belief becomes relevant to the determination of whether a reasonable person in the detainee's position would believe he is in custody.

11

382 S.W.3d 367, 373 (Tex. Crim. App. 2012). According to appellant, the "question by its very nature conveyed to Appellant the officer's subjective belief that Appellant was a suspect and that his freedom had been restrained 'to the degree of formal arrest' as described in *Ortiz*." Because the "officer's obvious intent was to detain Appellant for questioning regarding driving while intoxicated, which ultimately led to his arrest and conviction for intoxication manslaughter," appellant contends that he should have been read his *Miranda* warnings before Wagganer inquired as to how many drinks he had.

We agree with the State that, as a threshold matter, the trial court correctly determined that appellant failed to establish that he was in custody, which was his burden. "The State has no burden at all unless 'the record as a whole clearly establishe[s]' that the [appellant]'s statement was the product of custodial interrogation by an agent for law enforcement." *Herrera*, 241 S.W.3d at 526. "It is the defendant's initial burden to establish those facts on the record." *Id.* (citing *Wilkerson v. State*, 173 S.W.3d 521, 532 (Tex. Crim. App. 2005)). "[W]e afford almost total deference to a trial judge's 'custody' determination when the questions of historical fact turn on credibility and demeanor." *Id.* at 526–27.

Here, Wagganer arrived upon a serious accident scene with an injured and unconscious passenger and a possibility injured driver. Wagganer testified that his first priority was assessing injuries, tending to Tina, and generally determining

12

whether this would ultimately be a crime scene. Appellant does not claim that Wagganer actually restrained him in any way. And the record demonstrates that the only restriction on appellant's physical movements was Wagganer's repeated request that appellant quit approaching and shaking Tina's unmoving body because he might exacerbate a neck injury. Appellant continued to walk around until the paramedics arrived and transported him to the hospital.

At most, the smell of alcohol on appellant caused Wagganer to inquire about his alcohol consumption and ultimately call for a DWI investigator. Wagganer testified that when he asked about appellant's alcohol consumption, appellant was not under arrest and that he did not have sufficient cause to arrest him at that point. Without more, on this record appellant cannot establish that he was in custody. *E.g.*, *State v. Stevenson*, 958 S.W.2d 824, 829 (Tex. Crim. App. 1997) ("[E]ven if appellee had become the focus of a DWI investigation, that fact alone would not give rise to custody."). The San Antonio Court of Appeals recently rejected an argument similar to appellant's here, expressly holding that an accident investigation that turned into a DWI investigation was not a custodial situation for purposes of *Miranda*, even though in that case—unlike here—the questioning officer subjectively intended to detain the defendant:

> We hold the facts in this case do not establish Hines was in custody. The record shows Officer Gallegos initially questioned Hines to investigate the accident. The accident investigation became a DWI investigation after Officer Gallegos discovered reasons to suspect

13

Hines was intoxicated. Moreover, Hines was not in the type of police-dominated atmosphere contemplated by *Miranda*. Rather, he was in plain view of passing cars and other non-law enforcement individuals. Regardless of Officer Gallegos' subjective belief that Hines was not free to leave, the objective circumstances as a whole would not lead a reasonable person to believe he was in custody.

*Hines v. State*, 383 S.W.3d 615, 622 (Tex. App.—San Antonio 2012, pet. ref'd); *see also id.* ("The Texas Court of Criminal Appeals has held that on-the-scene police questioning of drivers about an accident is not a custodial interrogation."). The trial court did not abuse its discretion in concluding that appellant did not demonstrate that a reasonable person in his shoes would have believed his freedom of movement was restricted to the degree of an arrest when Wagganer asked him how much he had to drink.

Because we find no *Miranda* violation we overrule point of error one. We also overrule point of error two to the extent appellant argues that admission of recordings of the question-and-answer exchange about how much appellant had to drink violates *Miranda*.

**RULE 403**

Subsumed within appellant's second point of error, he also complains that any probative value in the admission of the dash camera video was substantially outweighed by the danger of unfair prejudice, confusion of issues, and misleading the jury. In his third point of error, he complains that various photographs should

14

not have been admitted because they were cumulative, or because their probative value was substantially outweighed by the danger of unfair prejudice.

## A.    Applicable Law

"All relevant evidence is admissible, except as otherwise provided"; "[e]vidence which is not relevant is inadmissible." TEX. R. EVID. 402. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable." TEX. R. EVID. 401.

Under rule 403, evidence, although relevant, may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or needless presentation of cumulative evidence. TEX. R. EVID. 403.  Once a rule 403 objection is made, the trial court must weigh the probative value of the evidence to determine if it is substantially outweighed by its potential for unfair prejudice.[1]  *Santellan v. State*, 939 S.W.2d 155, 169 (Tex. Crim. App. 1997). The rules of evidence favor the admission of

---

[1]    A rule 403 balancing test includes the following factors: (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest a decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. *Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006).

relevant evidence and carry a presumption that relevant evidence is more probative than prejudicial. *Jones v. State*, 944 S.W.2d 642, 652 (Tex. Crim. App. 1996).

We review a trial court's rulings on the admission of evidence under an abuse of discretion standard and will not reverse absent a clear abuse of discretion. *Apolinar v. State*, 155 S.W.3d 184, 186 (Tex. Crim. App. 2005). If the trial court's decision to admit the evidence lies within the zone of reasonable disagreement, then the decision must be upheld. *Rankin v. State*, 974 S.W.2d 707, 718 (Tex. Crim. App. 1998) (op. on reh'g); *see also Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g).

When recordings and photographs are erroneously admitted, we must conduct a harm analysis to determine whether the error calls for reversal of the judgment. TEX. R. APP. P. 44.2. If the error is constitutional, we apply rule 44.2(a) and reverse unless we determine beyond a reasonable doubt that the error did not contribute to appellant's conviction or punishment. TEX. R. APP. P. 44.2(a). Otherwise, we apply rule 44.2(b) and disregard the error if it did not affect appellant's substantial rights. TEX. R. APP. P. 44.2(b); *see Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh'g). A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S. Ct. 1239,

1253 (1946)). Conversely, an error does not affect a substantial right if we have "fair assurance that the error did not influence the jury, or had but a slight effect." *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001); *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998).

## B.     Analysis

*The dash-camera video*:    Appellant argues that "the dash cam video presented evidence, the probative value of which was substantially outweighed by the danger unfair prejudice, confusion of the issues, or misleading the jury." Specifically, he argues, "the statements immediately and deliberately elicited from Appellant by the officer were more prejudicial than probative when the basis for any such impairment by Appellant at the scene of a fatal traffic accident had not been determined."   His argument is essentially that the video could have no probative value in demonstrating signs of his impairment because he "had been in a very serious accident, which was at least equally able to render him 'not having the normal use of his mental and physical faculties.'"   Because, according to appellellant, the video is "not circumstantially relevant," the "heightened probability of confusing the effects of the accident with facts probative of intoxication is unfairly prejudicial and substantially outweighed by the danger of misleading and confusing the jury."

17

Appellant admitted to drinking alcohol on the video at issue, but claimed that he had only had "two beers"—a fact refuted by significant other evidence, including Smith's testimony about how much alcohol appellant had consumed before the accident. Appellant has not overcome the presumption that this relevant video is more probative than prejudicial, *Jones*, 944 S.W.2d at 652, nor has he argued—much less demonstrated—that the impact of such evidence would not be rendered harmless by the substantial other evidence at trial of his intoxication.

*Pictures*. Before trial, in response to appellant's complaint that many of the State's pictures he had reviewed were cumulative, the State noted that it had narrowed down the original 200 photos to 66. During Wagganer's direct-examination, the State elicited testimony that the 66 (numbered State's Exhibits 5–70) pictures accurately reflected the scene the night of the accident, and then requested that the court admit the photos into evidence. When appellant objected, the court held a hearing, outside the presence of the jury, to review and discuss the pictures.

Ultimately, appellant did not object to State's Exhibits 5–29 or 36, which were photographs of debris on the street, a downed street sign, damage to the curb, damage to the fence and residence struck by the Corvette, and a picture of the Corvette in the spot it landed. Appellant also had no objection to State's Exhibits 43–52, 55, 57–62, and 64–70 which were similar to some of the other pictures

18

taken of the street and the yard where the Corvette landed (but taken in the daylight) as well as pictures of the tow truck and the deployed airbags on the Corvette.

State's Exhibits 30–35 were photographs of the wrecked Corvette from different angles. The State explained the significance of each, and offered to withdraw its offer of State's Exhibit 35 after the court expressed the view that it was too similar to State's Exhibit 34. With regard to the other vehicle photos, the court discussed the relevant factors in considered in its Rule 403 analysis and admitted the State's Exhibits 30–34 over appellant's objection.

As for State's Exhibits 37–42, which were pictures of Tina's body, appellant asked that the State be required to select only one for the jury to see. The State explained that these pictures showed Tina's body from different angles, one showed that she was wearing her seatbelt, and one showed her body after she was pulled from the car. The court admitted the pictures, overruling appellant's objection that these were cumulative, noting again that it took into account the pictures' details, size, and the fact that each picture depicts different angles, views, or different items being presented to the jury.

Appellant's objection to the last pictures, State's Exhibits 53, 54, 56 and 63 was that they were all pictures of the wrecked Corvette. Specifically, appellant argued that "[o]ne photograph of the automobile crash would certainly be enough

19

to express the State's position in this matter," and that the "cumulative effect of all four being introduced is simply–the results of that are to affect the prejudice and emotions of the jury, which would deny my client a fair trial." In response, the State explained that it had carefully culled down its numerous pictures and selected each of these four because they demonstrated an aspect of the scene and the car not evident from the other pictures. The court found the pictures to be relevant, not cumulative, and concluded that the probative value was not outweighed by any potential prejudice.

In arguing here that allowing all of these objected-to pictures to be admitted was reversible error, appellant notes that he did not contest the fact that Tina was killed in the accident. Thus, he contends, the photographs of the Corvette and Tina's body at the scene "could serve no possible purpose other than to inflame the jury." We disagree and hold that appellant has not established that the trial court abused its discretion in admitting these photographs. *Paredes v. State*, 129 S.W.3d 530, 539 (Tex. Crim. App. 2004) ("The admissibility of a photograph is within the sound discretion of the trial judge."). The record reflects that the trial court considered each of appellant's arguments and determined that each photograph was relevant and not unduly prejudicial,

> [T]he Court finds that they are relevant and would furthermore --
> them being relevant -- that the probative value is not substantially
> outweighed by the danger of unfair prejudice, confusion of the issues,
> misleading the jury, considerations of undue delay, or needless

20

presentation of cumulative evidence. Furthermore, the Court has looked at these as well as the other photos and considered the amount, the detail, the different angles, different viewpoints with regard to those; and, therefore, will admit those and has balanced those as well as the other factors that I have previously mentioned that the Court has balanced those previous factors that I had mentioned with regard to the other exhibits, as well. I had weighed and balanced all of those factors, not exclusive of those mentioned, and make the determination that under 403, the probative value is not substantially outweighed by the danger of unfair prejudice.

The Court of Criminal Appeals has generally held that photographs are admissible when verbal testimony as to the matters depicted in the photos is also admissible. *Williams v. State*, 958 S.W.2d 186, 195 (Tex. Crim. App. 1997). Appellant does not argue that anything in the pictures was altered in any way that enhances the gruesomeness of Tina's body or the scene. *See Shuffield v. State*, 189 S.W.3d 782, 787 (Tex. Crim. App. 2006). " The fact that the scene depicted in the photograph is gory and gruesome does not make the photograph more prejudicial than probative when the crime scene is gory and gruesome." *Shavers v. State*, 881 S.W.2d 67, 76 (Tex. App.—Dallas 1994, no pet.).

In sum, we overrule point of error two to the extent appellant argues that admission of the dash and audio recordings was erroneous under Rule 403, and we overrule point of error three because appellant has not demonstrated that the trial court abused its discretion in admitting photographs of Tina and the collision scene.

# CRIME LAB REPORT

By agreement, portions of appellant's medical records were introduced into evidence. Nurse Salinas, the medical provider who drew appellant's blood separately for medical purposes and for alcohol-testing purposes, testified without objection that that the results of appellant's blood alcohol tests were .142, which was well above the legal limit of .08, and approaching the toxic range of .25. Nurse Salinas also testified to the results of appellant's urinalysis, which indicated that he had cannabis, or marihuana, in his system when he was brought to the hospital after the collision.

When the State sought to introduce the Pasadena Police Department Regional Crime Laboratory Report, which also contained the results of appellant's blood tests, appellant objected. Outside the presence of the jury, the court permitted appellant to take D. Sanders, the sponsoring witness, on vior dire. Sanders is a chemist, toxicologist, and technical supervisor with the City of Pasadena Police Department Crime Laboratory. During this examination, Sanders agreed that he (1) did not know if a warrant for the blood was obtained, (2) did not know whether the room in which the blood was drawn was properly sanitized, (3) did not know if appellant's arm was properly cleaned, (4) did not know if the blood was properly drawn or the vials properly sealed, and (5) did not know what procedures or protocols were followed before the blood arrived at the lab.

On appeal, appellant argues that the State failed "to qualify the witness pursuant to the standard set in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 590–92 (1993).

The State responds that appellant's objections at trial were specific to chain-of-custody, and that the information that appellant complains Sanders could not provide in his testimony was provided by other witnesses. Specifically, the State notes that together the testimony of the DWI task force officer, the blood-draw nurse, and Sanders established the chain-of-custody and that proper protocols were followed. The State points out that the trial court performed a *Daubert* analysis, properly finding Sanders to be qualified and the scientific bases of his testimony to be valid,

> The Court does find, for purposes of this hearing: First of all, with regard to the admissions of the testimony through this witness, who is an expert witness, that the witness qualifies as an expert by reason of his knowledge, skill, training and experience; that the subject matter of the testimony is an appropriate one for expert testimony; and that admitting such expert testimony in this circumstance would assist the fact finder in deciding the case. Secondly, with regard to the scientific analysis and the results thereof, the Court would find that this specific scientific evidence -- that the underlying scientific theory to be valid; the technique, applying the theory to be valid; and the technique that was applied in this case was properly applied in this circumstance.

Finally, the State argues that any error would be harmless, as the very same information about appellant's blood-alcohol level and marihuana content objected to in the Crime Lab Report was admitted through appellant's medical records and

23

Salinas's testimony. We agree. *E.g., Coble v. State*, 330 S.W.3d 253, 282 (Tex. Crim. App. 2010) ("We have often held that erroneously admitting evidence 'will not result in reversal when other such evidence was received without objection, either before or after the complained-of ruling.'"); *Valle v. State*, 109 S.W.3d 500, 509 (Tex. Crim. App. 2003) ("An error [if any] in the admission of evidence is cured where the same evidence comes in elsewhere without objection.").

We overrule appellant's fourth point of error.

## CRASH DATA RETRIEVAL SYSTEM

Officer Ridings testified to his education, training, and experience in automobile accident investigation and reconstruction. Outside the presence of the jury, he testified about his examination of the Corvette's crash data retrieval system a/k/a the black box, which records certain events for five seconds before deployment of a vehicle's airbags. Ridings testified that data is retrieved from the box through a computer program and that he has performed this same analysis seven or eight times on other vehicles, but not on this particular type of Corvette. Appellant objected at trial, arguing that Ridings was not "qualified to testify as to the results of the download" of data from the black box. The trial court overruled that objection.

Here, appellant argues that the trial court committed reversible error allowing the State to admit an exhibit containing data from the crash data retrieval

24

system because the Ridings was not qualified under *Daubert*. The State disputes that *Daubert* has any application here, and points out that—in any event, appellant has never objected to the reliability of the airbag module—but instead only argued that the Ridings was not qualified to testify about the results. Finally, the State argues that even if Ridings were required to possess some particular qualification to review and testify to the results of the black box data download, Ridings possessed such qualifications. *Rodgers v. State*, 205 S.W.3d 525, 533 (Tex. Crim. App. 2006) (expert testimony is "liberally allowed" when the field is "not particularly complex, the witness's opinions are not conclusive, and consequently, they are generally not pivotal to the resolution of the case.").

In his brief, appellant cites the standards for evaluating the scientific reliability of particular evidence at length, but reliability was never raised in the trial court. More importantly, appellant has not argued how the evidence about his speed—the primary subject of Ridings testimony about the black box recording report—was harmful. Accordingly, we decline to decide on this record whether and under what circumstances expert testimony is required with regard to black box data and its retrieval. Instead, because we are confident that this particular black box evidence about appellant's speed before impact would not have impacted the jury's decision, we hold that any error in its admission would be harmless. TEX. R. APP. P. 44.2(b).

25

A similar issue was addressed in *Pena v. State*, also an intoxication-manslaughter case. 155 S.W.3d 238, 247 (Tex. App.—El Paso 2004, no pet.). The defendant in *Pena* challenged the qualifications of the accident-reconstruction officer and the reliability of the surveying instrument (i.e., the Accident Investigation Measuring System (AIMS)) used to estimate the defendant's pre-accident speed. *Id*. at 245–46. The court of appeals held that the officer was qualified through his training and experience, but that the State had failed to establish the reliability of the AIMS formula supporting his testimony that the defendant's car was travelling 106 miles per hour before the fatal accident at issue. *Id*. at 246. In concluding that admission of the speed testimony was erroneous but nonetheless harmless, the court noted that evidence of a particular speed is not necessary to support an intoxicated-manslaughter conviction. *Id*. Rather, the jury must find that the defendant was intoxicated while driving in a public place, and that intoxication caused the death of the victim. *Id*. at 247. The *Pena* court relied upon the abundance of other evidence about the defendant's unsafe speed and the elements of intoxication manslaughter:

> The evidence shows that Appellant was driving in excess of 60 miles per hour as he passed Zachary Valenzuela and approached the Lee Trevino Gateway West intersection. Mr. Valenzuela did not see Appellant attempt to brake prior to the accident and witnesses testified that the intersection was well-lit and the roadway was dry. Physical evidence and witness testimony indicated that the front of Appellant's vehicle collided with the rear end of the victims' vehicle, causing their vehicle to go airborne and spin around to face oncoming traffic.

26

Through her rearview mirror, Veronica Huerta Garcia saw Appellant's vehicle slam against the guardrail at a high speed, causing sparks to fly. In unchallenged testimony, Officer Cisneros testified that he found no pre-impact brake marks and no pre-impact skid marks at the accident scene. El Paso County Medical Examiner Dr. Juan Contin testified that the passenger victim bled to death from a torn aorta, resulting from the collision. Dr. Contin also testified that the driver victim died the following day in the hospital from injuries sustained in the collision.

After examining the record as a whole, we find the evidence above was sufficient to support the jury's affirmative finding that Appellant used his motor vehicle in a manner that was capable of causing death or serious bodily injury, without considering the speed evidence introduced through Officer Cisneros' testimony. The trial court's erroneous admission of the speed evidence did not affect Appellant's substantial rights and in light of other properly admitted evidence we are assured that if its admission influenced the jury at all, it did so only slightly. Therefore, we find the trial court's error to be harmless.

*Id.*

Similarly, here Wagganer estimated—without objection—that appellant was travelling over 100 miles per hour when he passed Wagganer right before the collision. Ridings testified about his team's conclusion that the Corvette was travelling at such a high rate of speed that it was airborne when it crashed through the cinderblock fence. Smith likewise testified that appellant was speeding and driving unsafely shortly before the accident. Finally, the Corvette travelled a significant distance off the road and suffered devastating damage, which is consistent with the other evidence that appellant was driving at an unsafe speed. In

27

light of this evidence, we conclude—as the *Pena* court did—that any "erroneous admission of the speed evidence did not affect Appellant's substantial rights." *Id*.

We overrule appellant's fifth point of error.

## FAILURE TO TESTIFY

In his sixth point of error, appellant argues that the State improperly commented on his decision to not testify at trial during the following exchange with Officer Redings:

> Q. In your opinion, was the vehicle in this case used as a deadly weapon?
>
> A. Yes.
>
> Q. Did the driver of this motor vehicle cause his vehicle to collide with a wall?
>
> A. Yes.
>
> Q. And you've already said that in your opinion, intoxication caused this crash?
>
> A. Yes.
>
> Q. What do you base your opinions on?
>
> A. I believe, due to the impairment of the operator, that he was operating at unsafe speeds and was unable to control his vehicle and maintain his vehicle on the public roadway, which caused him to lose control, striking the curb and launching him into the fence itself, which, in turn, caused the decedent to be in the state she is now.
>
> Q. *At the scene -- well, were you aware that the defendant was claiming that a motorcycle had cut him off?*

Appellant objected that this question "jeopardized his right not to testify," and argued that "he may be forced to testify to clarify these matters."

Outside the presence of the jury, the State clarified that it was only referring to appellant's statement to Wagganer at the scene that had already been heard by the jury, and explained to the court that it was just going to ask whether Ridings took that into account in forming his opinion that intoxication caused the accident.

> COURT: What is the rest of the question that you were going to ask with regard to that?
>
> [STATE]: What I'm asking him is: At the scene -- which was recorded on video and it's already been played to the jury -- the defendant says, A motorcycle cut me off. I'm asking if he took that into consideration in forming an opinion in this case. Did he believe that, based on the evidence? And I just want to make it clear, for the record, that I have in no way alluded to anything about the defendant testifying or not testifying. I am referring to the video that has already been introduced and played for this jury, and we've already discussed it with Officer Wagganer and the different stories that the defendant told . . .
>
> . . . .
>
> THE COURT: What is, the fact that there was testimony elicited as to -- whether you choose to believe or whatever the jury heard or didn't hear on the video -- there clearly was testimony that was elicited as to and that is in front of this jury -- from the officer's statements that were made at the scene by your client. And with regard to this witness, as a proffered expert, the State -- I'll allow them to ask a question as to whether or not his findings are consistent or inconsistent with such a statement. I mean, he's not making any ultimate determination as to what the jury's ultimate answer is to the ultimate issues in this case with regard to it; but he certainly can -- I will allow them to ask that question with regard to it. But, again -- well, I've said enough with regard to that.
>
> . . . .
>
> THE COURT: All right. In terms of the form of your question going forward, I will allow you to ask a question as to whether this is consistent or inconsistent with someone braking or swerving, however you want to do that without getting into how that was elicited or said.

29

MS. COOPER: Yes, Your Honor.

THE COURT: So, you can phrase it in terms of that circumstance, but not as to who said so that we're getting into comparisons of that.

MS. COOPER: Yes, Your Honor.

. . . .

(Jury enters courtroom.)

THE COURT: You may be seated.

Q. Is the evidence at the scene consistent with a motorcycle cutting off the Corvette?

A. No.

Q. Why not?

A. From the video that I observed, there was actually a really good distance between the motorcycle and the Corvette.

Q. I'm showing State's Exhibit No. 4.

If we stop it, can you see where the motorcycle is and can you see where the Corvette is?

A. Yes.

Q. Did you use this video in forming your opinions --

A. Yes, I did.

Q. -- and conclusions on this case?

A. Yes, I did.

Commenting on an accused's failure to testify violates his state and federal constitutional privileges against self-incrimination. *Canales v. State*, 98 S.W.3d 690, 695 (Tex. Crim. App. 2003); *Bustamante v. State*, 48 S.W.3d 761, 764 (Tex. Crim. App. 2001). "Such a violation occurs when 'the language used was manifestly intended or was of such a character that the jury would necessarily and naturally take it as a comment on the defendant's failure to testify.'" *Archie v.*

30

*State*, 340 S.W.3d 734, 738 (Tex. Crim. App. 2011) (quoting *Cruz v. State*, 225 S.W.3d 546, 548 (Tex. Crim. App. 2007)). The Court of Criminal Appeals has admonished that, "[i]n applying this standard, the context in which the comment was made must be analyzed to determine whether the language used was of such character." *Bustamonte*, 48 S.W.3d at 764.

Here, we agree with the State that the question posed to Ridings, taken in context, was not a comment on appellant's failure to testify. Rather, as the trial court correctly noted, it was a comment about evidence that had already been put before the jury about what appellant said at the scene of the collision before his arrest through both the video and Wagganer's testimony.

Because appellant has not shown that the State made a comment manifestly "intended or . . . of such a character that the jury would necessarily and naturally take it as a comment on the defendant's failure to testify," *Archie*, 340 S.W.3d at 738, we overrule appellant's sixth point of error.

## CONCLUSION

We affirm the trial court's judgment.

Sherry Radack<br>
Chief Justice

Panel consists of Chief Justice Radack and Justices Massengale and Huddle.

Do not publish. TEX. R. APP. P. 47.2(b).