

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-13-00194-CR

_____

JOE BOYCE COX, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 6th District Court
Lamar County, Texas
Trial Court No. 23689

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Chief Justice Morriss

# O P I N I O N

The State's motion to revoke Joe Boyce Cox's community supervision,[1] which had been imposed after his conviction for felony driving while intoxicated (DWI),[2] alleged that Cox had violated the terms of his community supervision, by consuming alcohol and failing to have a SOBERLINK[3] device installed by May 23, 2013.  Cox's community supervision was revoked, and he was sentenced to five years' incarceration.  Because (1) there was no proper evidence of Cox's further alcohol consumption and (2) revocation based on Cox's failure to have a SOBERLINK device installed by May 23, 2013, violated Cox's due-process rights, we reverse the order of revocation and remand this case to the trial court.

## (1)     There Was No Proper Evidence of Cox's Further Alcohol Consumption

The State alleged that, while on community supervision, Cox consumed alcohol, though he had been ordered not to do so.  Proof of this alleged violation came entirely from evidence of positive readings from his SOBERLINK device.

The State presented testimony from John O'Donnell, who managed the SOBERLINK division of Recovery Healthcare Corporation.  O'Donnell testified regarding records, admitted as State's Exhibit 1, that purported to show multiple occasions where Cox submitted breath samples

---

[1]In 1993, during the 73rd Legislative Session, the statutory term "probation" was changed to "community supervision."  Both terms refer to the same process.  *See Ivey v. State*, 277 S.W.3d 43, 51 n.48 (Tex. Crim. App. 2009).

[2]*See* TEX. PENAL CODE ANN. § 49.09(b) (West Supp. 2014).

[3]A SOBERLINK device is a "portable, hand-held breath analyzer that remotely monitors an individual's breath content."  The record contains different forms of the name of the device, such as Soberlink and Sober Link.  The name of the company that invented these devices is SOBERLINK, Inc., and the company's website and product literature refer to them as SOBERLINK devices.  *See* SOBERLINK, http://www.soberlink.net (last visited September 23, 2014).  We will follow the company's lead by referring to the device at issue in this case as a SOBERLINK device.

2

containing alcoholic content. Cox made several objections, including that the State offered no testimony establishing the reliability of the scientific theory on which this data was based. We agree with Cox on this point.

A proponent of evidence based on scientific theories must demonstrate the reliability of the science which generated the evidence.

> [Texas] Rule [of Evidence] 702 provides that if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise. The threshold determination in an inquiry into the admissibility of scientific evidence is whether the evidence is helpful to the trier of fact, and for such evidence to be helpful, it must be reliable. A trial court must act as a gatekeeper to ensure that unreliable evidence does not reach the trier of fact.

*Somers v. State*, 368 S.W.3d 528, 535–36 (Tex. Crim. App. 2012) (citations omitted); *see* TEX. R. EVID. 702. For scientific testing results to be considered reliable, three criteria must be satisfied: "(a) the underlying scientific theory must be valid; (b) the technique applying the theory must be valid; and (c) the technique must have been properly applied on the occasion in question." *Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992). Suggested factors in the trial court's determination of reliability include:

> (1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community, if such a community can be ascertained; (2) the qualifications of the experts testifying; (3) the existence of literature supporting or rejecting the underlying scientific theory and technique; (4) the potential rate of error of the technique; (5) the availability of other experts to test and evaluate the technique; (6) the clarity with which the underlying scientific theory and technique can be explained to the court; and (7) the experience and skill of the person(s) who applied the technique on the occasion in question.

*Id.* Here, the State offered nothing to explain the scientific theory on which the SOBERLINK reports were based.

O'Donnell acknowledged he was not an expert[4] on how the device worked, though he had "been taught that it detects ethanol alcohol" and that mouthwash with ethanol would produce a report of alcohol content in the breath. Through this testimony, the State had admitted SOBERLINK reports showing multiple dates with "positive" or "missed" "BrAC"[5] tests and breath-alcohol content results for these putative positive tests. Nothing at all was offered to explain how the SOBERLINK machine operated, how it measured breath-alcohol content, how it generated or recorded the test results, or how the reliability of these test results could be measured. We have found nothing to establish that the science behind the SOBERLINK method of acquiring data "has been widely accepted in a sufficient number of trial courts through adversarial gatekeeping hearings." *See Somers*, 368 S.W.3d at 536. Since there was no testimony or evidence offered to address any of the *Kelly* factors listed above, admission of the test results was error. *See Pena v. State*, 155 S.W.3d 238, 246 (Tex. App.—El Paso 2004, no pet.) (error to admit officer's testimony about measuring defendant's driving speed at time of impact where no evidence to satisfy *Kelly*'s reliability requirement; error harmless).

Having found error, we now conduct a harm analysis. We treat this error, violation of the *Kelly* requirements, as nonconstitutional error. *See id.* In our review of nonconstitutional error, such as this, we are to disregard errors, defects, irregularities, or variances that do not affect

---

[4]Brad Burger, who installed Cox's SOBERLINK, also acknowledged his lack of expertise.

[5]This appears to mean breath-alcohol content.

substantial rights of the accused. Tᴇx. R. Aᴘᴘ. P. 44.2(b). A "substantial right" is touched when an error had a substantial and injurious effect or influence on the verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). We do not overturn a conviction unless, after a review of the whole record, we determine that an error may have substantially influenced the outcome. *Burnett v. State*, 88 S.W.3d 633, 637 (Tex. Crim. App. 2002).

Here, the SOBERLINK results were the sole link to establish one allegation used to revoke Cox's community supervision. Absent the SOBERLINK evidence, there was no evidence of alcohol consumption. Even under the harmless error standard for nonconstitutional error, we are sure that admission of the SOBERLINK records had a deleterious effect on the outcome of Cox's proceeding. The trial court found that he had consumed alcohol, one of the two violations found by the trial court. Cox was harmed by the erroneous admission of this evidence. We sustain this point of error.[6]

*(2)*     *Revocation Based on Cox's Failure to Have a SOBERLINK Device Installed by May 23, 2013, Violated Cox's Due-Process Rights*

The other allegation was that Cox failed to have a SOBERLINK device installed by May 23, 2013, as ordered by the trial court.

Based on an earlier motion to revoke, Cox had been ordered to spend sixty days in the county jail and, on his release from that facility, to use a SOBERLINK device to monitor his

---

[6]Because we so conclude, it is unnecessary for us to address Cox's complaints that the SOBERLINK data was inadmissible under *Bullcoming v. New Mexico*, __ U.S. __, 131 S.Ct. 2705 (2011), and *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009), and that the records were improperly admitted under the business records exception to the rule against hearsay. *See* Tᴇx. R. Eᴠɪᴅ. 803(6).

continued community supervision. Cox was in jail April 19 to May 23,[7] and he was to have this SOBERLINK device installed by May 23. There is no dispute that Cox was released from the county jail May 23 and that he did not get a SOBERLINK device installed or activated until May 31, 2013, eight days after the date specified in the order. There is no indication of what time of day his release occurred.

At the hearing on this motion to revoke, the State asked Renee Clark, the supervising community supervision officer, why there was a "lapse in time between . . . April 19th and May 23rd" for Cox to have the SOBERLINK when the device was ordered at the April 19 hearing. Clark answered that this delay was because Cox "was in jail." She then stated, "[H]e was given, I believe, 10 days after the day he was supposed to be released in order to get the device." There is nothing about a ten-day grace period in the rest of the record. Other than the docket sheet entry noted, there is an order from the trial court modifying conditions of community supervision and ordering Cox to "have a properly functioning Recovery Healthcare Sober Link Intoxilyzer designed to detect the consumption of alcohol and pay all fees associated with said device to begin May 23, 2013." However, the State did not controvert this ten-day grace period.[8] Other than Clark's testimony, no mention of the grace period was made at the revocation hearing by the attorneys or the trial court.

---

[7]The trial court's docket sheet note for April 19 states that Cox was assessed sixty days in jail as a sanction and that he would receive credit for time served. Further, the docket sheet entry reads, "After release from jail, Def. must have an In-Home monitor for 12 months."

[8]The community supervision officer could not modify the trial court's conditions of supervision without the trial court's authorization. *See* TEX. CODE CRIM. PROC. ANN. art. 42.12, § 10(d) (West Supp. 2014).

6

Cox argues he was denied due process by the finding he violated the community supervision term requiring him to have the SOBERLINK by May 23. First, he points out that he was not released from county jail until May 23. Next, he posits that he had substantial difficulty arranging for installation of SOBERLINK on his release. In cross-examining Clark, Cox suggested he had had a hard time contacting whoever was supposed to install[9] his SOBERLINK device.

> [Defense attorney]: Ma'am, When Mr. Cox was first ordered to get that SOBERLINK device and he would not do it, did you give him instructions about who to call?
>
> [Witness]: Yes, I did.
>
> Q. Who did you tell him to call?
>
> A. I believe it was Brad Burger. I gave him the phone number and the name of the person to call.
>
> Q. Did Mr. Cox later call you back and say that -- inform you that Brad Burger had said he couldn't install that because he was in Kaufman County and Mr. Burger didn't go to Kaufman County?
>
> A. I believe he was referred to someone else with the SOBERLINK device.
>
> Q. Right. And so when you got that phone call, you understood that Brad Burger couldn't do it and then he referred him to somebody in Dallas, right?
>
> A. I don't know who he referred him to.
>
> Q. A Mike Vanderwood.

---

[9]There is nothing explicit in the record detailing what installation entails. Burger, of Recovery Healthcare Corporation, said he "work[s] out of a mobile office out of [his] car. That's where we do the installation." This procedure consists of "[m]eet[ing] the client, find[ing] a place that's convenient for him and for me to park the car and to sit in and go over the contract that we have, the paperwork basically, which is personal information and the do's and don't's of using the device." Clark said the device is portable, such that the user can carry it around.

A.    I don't know who he referred him to.

Q.    Did you -- Mr. Cox later called you and said Mr. Vanderwood wasn't returning his calls?

A.    No.

Q.    You didn't have that conversation?

A.    I don't remember that conversation.

Q.    Did you have a conversation with anybody where you understood they -- people servicing Kaufman County couldn't get out there to do it in Kaufman County?

A.    No.

Q.    Didn't Mr. Burger tell you that -- exactly that when he was talking to you?

A.    I don't remember.

Q.    Okay.  Do you recall that there were issues and you actually moved -- gave him extra time because he couldn't get in touch with the people, the people couldn't service Kaufman County?

A.    No, I don't recall that.

Q.    So, your recollection is there were no phone calls to Mr. Cox explaining the difficulties he was having because Brad Burger didn't service Kaufman County?

A.     I said that he did call me once and that -- said that he'd talked to him and he was referring him to someone else.

Q.    Did you make notes of that conversation?

A.    No.

Q.    Did you make notes of any of your conversations?

A.    That's the only conversation.

8

Q.    That you remember?

A.    Yes.

Burger's testimony, to some extent at least, corroborates Cox's version of events, i.e., that there was some difficulty connecting with a SOBERLINK installer.  Burger said he received a call from a Vanderwood, another installer for Recovery Healthcare, who told Burger he could not locate Cox.  When asked by Cox whether Burger serviced the area of Kaufman County, Burger answered, "It's a zone that Dallas usually serves, but Mike [Vanderwood] and I kind of trade out on that line between Athens/Canton area.  If he's in another area I'll come over."  Burger seems to have acknowledged that Cox was first directed to him and that he then directed Cox to Vanderwood, who later asked Burger to contact Cox.  Burger testified on cross-examination,

> [Defense Attorney]:   In fact, if you recollect, didn't you get a call from Mr. Cox earlier and you told him that you didn't service Kaufman and you gave him Mr. Vanderwood's number?
>
> [Witness]:    That's a strong possibility, but I don't know when that happened.
>
> Q.    So it was first you and then Mr. Vanderwood and then Mr. Vanderwood back to you?
>
> A.    Vanderwood.
>
> Q.    Vanderwood?
>
> A.    That's correct.
>
> Q.    It was after that, not in Kaufman but in Athens, where you were finally able to meet with Mr. Cox after Mr. Vanderburg [sic] handed him back off to you, right?

A.  Mr. Vanderwood, and the initial location was Lamar County.

Q.  I understand.  But --

A.  That's why it went back to Mike because Mike works up this way, I do not.

Q.  I understand.  But it turned out he wasn't in Lamar County so you had to work from there?

A.  That's correct.

Burger did say, though, that "[i]t wasn't that difficult" to meet with Cox.  Within two telephone conversations, he was able to arrange a meeting with Cox, although it was in Athens, not in the Kaufman County area, as he had been expecting.  Burger met with Cox on Friday May 31, 2013, explained how to use the SOBERLINK, explained Cox's obligations regarding submitting samples, and assured himself Cox understood how to use the machine.  Nonetheless, the record does show that (a) Cox was not released from jail until May 23, (b) May 23 was the trial court's imposed deadline to have the SOBERLINK device installed or activated, (c) Cox contacted or tried to contact two Recovery Healthcare representatives and Clark about getting the device set up, and (d) someone—Clark, if not the trial court—gave Cox ten days following his release from jail to arrange the activation of the SOBERLINK.

As we have said, nothing in the trial court's order modifying supervision mentions a ten-day grace period to obtain the SOBERLINK.  Clark, as the supervising officer, could not modify the trial court's conditions of supervision to grant a ten-day window without the trial court's authorization.  *See* TEX. CODE CRIM. PROC. ANN. art. 42.12, § 10(d).  However, since Cox's day-to-day contact for how to abide by his terms of community supervision would almost certainly

10

be Clark, not the trial court, it would at least be inequitable to find him in violation of the May 23 order if he was credibly relying on his supervising officer's instructions.

The closest scenario we have found occurred in *DeGay v. State*,[10] where the defendant was placed on community supervision following a theft conviction. As part of his community supervision, DeGay was sent to a restitution center; when the State later moved to revoke his community supervision, the alleged violation centered on claims DeGay failed to abide by the required conduct of the restitution center. Specifically, he was to "[o]bey all rules and regulations of the Restitution Center." *Id.* at 446. At the center, probationer DeGay received conflicting instructions. The director of the facility told him he did not have to tender his entire paycheck to the center, but later, apparently on the instruction of that director, DeGay's supervising officer told DeGay to turn over his whole check. There was also a question of whether, if he turned his entire check over to the center, he could be in violation of the trial court's condition of community supervision to support his dependents. When DeGay did turn over all of one check, no funds were disbursed to DeGay's family.[11] There was no question that, on at least one occasion, DeGay did not tender his check to the center; that date was alleged in the motion to revoke and served as the basis for the trial court's revocation. However, he did hand over his next paycheck in full. *Id.* at 447–48. The Texas Court of Criminal Appeals pointed out that the revocation was based on

> a single violation of an oral order of a probation officer who instructed the
> appellant to change his manner of payments and to turn his entire check over to

---

[10]741 S.W.2d 445 (Tex. Crim. App. 1987).

[11]There were several other circumstances at play in *DeGay*; we have summarized the case as briefly as possible to apply its relative holding.

11

the restitution center. This order countermanded an earlier oral order to the appellant by the director of the restitution center to the contrary. The probation officer's oral order was also inconsistent with some of the conditions of probation [footnote omitted] and if obeyed would deprive appellant of the means of complying with court-imposed conditions of probation.

*Id.* at 450.

A trial court's order revoking community supervision is reviewed for an abuse of discretion. *Rickels v. State*, 202 S.W.3d 759, 763 (Tex. Crim. App. 2006). "The central issue to be determined in reviewing a trial court's exercise of discretion in a probation revocation case is whether the probationer was afforded due process of law." *DeGay*, 741 S.W.2d at 450. The *DeGay* court found that the appellant had not been afforded due process and that revocation was an abuse of discretion "given the circumstances of [that] particular case." *Id.*

Here, there was uncontroverted testimony Cox had been given a window of ten days from his jail release to satisfy the trial court's edict to obtain a SOBERLINK device. Cox obtained the device the eighth day after his release. Beyond that, it would have been extremely difficult, if not completely impossible, for Cox to comply with the letter of the order and have the device installed the very day he was released from confinement.[12] Even if the grace period described by Clark was not authorized or adopted by the trial court, Cox could reasonably rely on that extension. Faced with conflicting instructions and at least extreme difficulty, if not

---

[12]Although, statutorily, the impossibility of compliance is not explicitly a defense to revocation, due process requires it. *Perry v. State*, 367 S.W.3d 690, 694 (Tex. App.—Texarkana 2012, no pet.); *see Clay v. State*, 361 S.W.3d 762 (Tex. App.—Fort Worth 2012, no pet.) (Dauphinot, J., dissenting) (discussing inability to pay restitution).

impossibility, of performance, due process is offended in finding a violation.[13]  We sustain this point of error.

We reverse the trial court's judgment and sentence and remand this case to the trial court for proceedings consistent with this opinion.


Josh R. Morriss, III
Chief Justice

Date Submitted:     August 13, 2014
Date Decided:       September 29, 2014

Publish

---

[13]It is possible Cox's credibility in this whole scenario could have been impugned based on Burger's relation of Cox's conduct on their meeting.  Burger said that Cox asked him to delay installation of the device, as Cox "wanted to drink that weekend."  But that does not address the fact that he still had the device installed or activated within ten days of his release from jail.